IMPERIAL BOTTLE CAP & MACHINE CO. et al. v. CROWN CORK & SEAL CO. OF BALTIMORE CITY.

(Circuit Court of Appeals, Fourth Circuit. July 7, 1905.)

No. 506.

1. PATENTS—INVENTION—COMBINATION OF OLD ELEMENTS.

Where a patent covers a combination of old elements, and none of the prior inventors exhibits or suggests any co-operation of the elements upon the principle adopted by the later patent, or upon any principle adapted to serve the same purpose, the use of the old elements may limit, but cannot defeat, the patent.

[Ed. Note.—For cases in point, see vol. 38, Cent. Dig. Patents, §§ 27–29.]

2. SAME—NOVELTY—PRESUMPTION FROM GRANTING OF PATENT.

The presumption of novelty arising from the granting of a patent is greater or less according to circumstances. If the patent relates to something of temporary interest, and the object sought is of little importance, it may receive but little attention in the Patent Office, and the presumption is slight; but where the problem sought to be solved is of such importance that its solution promises great pecuniary returns, and it is shown that all the claims were subjected to critical analysis, resulting in amendments and disclaimers designed to distinguish the invention from everything in the prior art, the presumption of novelty is greater than in those cases where the patent may have passed by inadvertence.

[Ed. Note.—For cases in point, see vol. 38, Cent. Dig. Patents, § 53.]

3. SAME—INVENTION—PRESUMPTION FROM UTILITY.

Where there is an actual and admitted improvement in a combination of old elements, and its utility is shown in a marked degree, there should be controlling reasons to rebut the presumption that there is a sufficiency of invention to support a patent.

4. SAME—BOTTLE STOPPERS—INFRINGEMENT.

The Painter patent, No. 468,258, for a bottle stopper, was not anticipated in the prior art; and, while the device consists of a combination of old elements, it was the first to be fully successful in a field where there had been many failures, and discloses patentable invention. Such patent, however, is not infringed by the device of the Abbott patent, No. 704,167, which employs the same elements to accomplish the same result,

but under a different arrangement, in which they severally perform different functions, and are applied to bottles having differently shaped necks.

Goff, Circuit Judge, dissenting on the question of infringement.

Appeal from the Circuit Court of the United States for the District of Maryland.

For opinion below, see 123 Fed. 669.

H. T. Fenton and John E. Semmes, for appellants.

Robert H. Parkinson and John C. Rose, for appellee.

Before GOFF and PRITCHARD, Circuit Judges, and BRAWLEY, District Judge.

BRAWLEY, District Judge.   The validity of the Painter patent, No. 468,258, which the court below adjudged to have been infringed by defendants, was not challenged in the argument here when the case was submitted, but pending our consideration of the appeal, and prior to decision, the Circuit Court of Appeals of the Second Circuit delivered its opinion in Crown Cork & Seal Co. v. Standard Stopper Co., 136 Fed. 841, holding this patent invalid for want of patentable novelty.   In view of the importance of having uniformity of adjudication in the federal tribunals, especially in patent causes, where the Supreme Court is reluctant to issue its writs of certiorari, involving, as they generally do, merely questions of fact, we ordered a reargument at the May term, and the case is now before us for our determination.   It is not claimed that the judgment of the Circuit Court of Appeals of the Second Circuit is controlling in the sense that the question is res adjudicata, but the high respect we have for the ability, learning, and experience of the judges of that court is a very persuasive reason for following it, when by so doing we may assist in securing that uniformity which is very desirable, thus avoiding confusion and preventing repeated litigation of the same question; but the parties before us have the right to our individual judgment, and considerations of convenience and expediency must give way to demands of duty, from which we cannot be absolved by the doctrine of comity.   "Comity persuades," says Mr. Justice Brown in Mast, Foos & Co. v. Stover Mfg. Co., 177 U. S. 488, 20 Sup. Ct. 708, 44 L. Ed. 856, "but it does not command.   It declares not how a case shall be decided, but how it may with propriety be decided.   It recognizes the fact that the primary duty of every court is to dispose of cases according to the law and the facts; in a word, to decide them right.   In doing so the judge is bound to determine them according to his own convictions.   If he be clear in those convictions, he should follow them.   It is only in cases where in his own mind there may be a doubt as to the soundness of his views that comity comes in play, and suggests a uniformity of ruling, to avoid confusion until a higher court has settled the law.   It demands of no one that he abrogate his individual judgment, but only that deference shall be paid to the judgments of other co-ordinate tribunals."

Many of the considerations that give weight to adjudications in other courts of equal and final authority are absent here.   There

has been no concordance of opinion among several courts, nor has the decision stood for a series of years with general acquiescence therein, where business interests in reliance thereon have adjusted themselves thereto, and public policy requires adherence. If there had been anything like unanimity of opinion among learned judges whose experience in patent causes is so much greater than ours, it would so far awaken doubts as to the correctness of any opinion that we might entertain in opposition thereto that we would be inclined to defer to it. That was the case in Beech v. Hobbs, 92 Fed. 146, 34 C. C. A. 248, cited by defendants, where a carefully considered opinion of Judge Coxe was unanimously affirmed by the Circuit Court of Appeals, Second Circuit, and followed in the First Circuit. Here we have two circuit judges on one side, and two circuit judges on the other. Therefore we cannot feel ourselves permitted to accept this judgment as controlling, and proceed, not without misgivings, to state our conclusions:

The patent in suit was granted to William Painter February 2, 1892. It is one of a number of bottle-sealing devices by which Painter had undertaken to provide a substitute for the long cork which prior to this time was generally used as a stopper for bottles. One of his patents was before us in 1901, and in the opinion reported (Crown Cork & Seal Co. v. Aluminum Stopper Co., 108 Fed. 845, 48 C. C. A. 72) some account is given of the condition of the industry and of the state of the art before his inventions were put on the market, which need not be repeated. The device embraced in the patent is generally known as the "crown seal," and for convenience will be so designated, and for the same reason the appellants will be herein referred to as the defendants, and appellee as the plaintiff.

The proofs show that the "crown seal" went rapidly into public use, that it is fast superseding all other bottle-stopping devices; that demand for it is constantly increasing, and that during the year preceding the taking of the testimony over 425,000,000 were sold; that the cost is about one-fourth or one-third of the old method; that it is capable of rapid application and easy removal, and is thoroughly sanitary. All of these advantages have secured for it phenomenal commercial success.

There are nine claims in the patent, and they have been referred to—perhaps truly—as unnecessarily verbose, and it does not seem necessary to recite them all. The patent is for a combination, and does not purport on its face to be a pioneer. As shown in the exhibits in the preferred form, the device is a hard metal cap, in which there is a sealing disk of cork about one-ninth of an inch in thickness, encircled by the cap, which is provided with corrugated, vertical flanges, extending substantially throughout its depth. The flanges of the cap are bent by suitable pressure, by a machine adapted to the purpose, under the shoulder, which is some distance below the bottle mouth. The locking of the cap under the shoulder holds the cap and the cork disk inside of the cap in sealing contact with the bottle head, and the lower edge of the flange, under the overhanging shoulder, projects sufficiently to permit a

prong or lever to easily pry off. The corrugations of the flange serve as a sort of cushion or yielding material between the metal and the glass, thus overcoming the difficulty incident to a rigid compression of metal against glass. They also, while permitting the inner ridges to yield and conform to the inequalities inseparable from glass bottles, enable the excess of material incident to the compression of the circumference of the flange around the bottle neck to be taken up. The apices or outer ridges of the corrugations serve as fingers or prongs, which the engaging tool can readily take hold of for the purpose of separating the cap from the bottle. This brief description, which will have to be enlarged upon hereafter in considering the case in another aspect, will, it is believed, suffice to present the question which lies upon the threshold; that is, whether there is sufficient patentable novelty to support the patent.

It may be conceded at the outset that none of the elements of the combination are new. The history of the patent in its progress through the Patent Office, as shown by the contents of the file wrapper, takes more than 50 pages of the record, and shows what was disclaimed, what was rejected, and what was allowed. Metallic sealing caps are admittedly old, the pendant flanges are old, and there is nothing new in corrugated metal. The patents which in the opinion of the court of the Second Circuit led to the conclusion that Painter's patent was void will be considered in the order in which they are presented in that opinion:

(1) Whittlesey patent, granted May 19, 1863. The claims are for "a cap for sealing fruit cans, etc., having a flat top, tapering slightly, and corrugated flange edge." That the Whittlesey cap has a visual resemblance to Painter's cap is undisputed, but there all resemblance ends. It does not profess to be a device for stopping bottles containing gaseous liquids. It is simply a metallic covering for a jar, and it has "slightly tapering sides," which, by peripheral contact with the sides of the jar, secure sufficient snugness of engagement to make a closure. There is no sealing disk; no compression of the disk in the mouth of the jar; in fact, the law of its operation negatives a sealing disk. There is no shoulder, nor bending of the flange under the shoulder for the purpose of locking it and holding the cap in its place. All that it purported to be was a "cheaper, more durable, useful, and ornamental article to serve as a cap for jars." The reference to cheapness and durability as the object of the invention manifestly indicates the intention of its being used over and over again on jars kept in an upright position, while the provision for ornamentation shows the object of corrugating the edge, for the scallop shown in drawing below the smooth, tapering portion has no other office. The extension of the vertical corrugations to the sides of the cap would have entirely defeated the Whittlesey plan. No amount of mechanical skill in carrying out this plan could reach the result attained by Painter, or anything like it. Taught by Painter, it is easy enough now to say that the Whittlesey cap, plus a sealing disk, plus a shoulder, plus some method of securely locking the cap, plus elements nei-

ther claimed nor suggested in the patent, and by the entire abandonment of the Whittlesey plan, might be converted into something capable of serving the purpose of Painter's devices, as any other piece of dumb metal might be so converted; but no amount of mechanical skill, carrying out the Whittlesey plan, could change this absolutely inutile thing into anything approaching the crown seal.

(2) Butler patent, July 9, 1872. The claims of this patent are "the cap, provided with the annular shaped depression, the saucer, and the slit flange." In this device the bottom of the annular depression is filled with wax, and when heated the cap can be applied over the mouth of the bottle or jar. The depression or saucer on the upper side is filled with cold water which will immediately chill the wax and other substance, and prevent it from running down the inside of the bottle. The lower edge of the flange is turned in—partly, as stated, to give a "neat finish," and partly to prevent the wax from running out. It was not intended that this flange should be pried off, for there is no projecting edge to afford a surface with which an opener would engage. The provision for unsealing the jar is the pouring of hot water into the depression or saucer, which melts the wax and allows the cap to be removed. In short, it is a metal covering stuck on the jar by melted wax. There is no sealing disk, no locking shoulder, no corrugations in the flange, nor the equivalent therefor. The court does not in its opinion point out wherein this device approaches Painter's, or remotely anticipates it, and without such assistance we cannot see it.

(3) Berthoud-Gedge patents. These are not strictly before us, for the learned counsel for defendants omitted to introduce them in the record among the many that were offered to show the state of the art. Such omission naturally raises the presumption that they were not considered helpful to his cause, but, as they were in the New York case, it was stated in the argument that there was no objection to our considering them as if they were in the record. The first patent was taken out by Berthoud & Co. in France, May 1, 1877, and was for preserving food substances—conserves alimentaires—in glass. The difficulty of effecting a sealing of metal upon glass is recognized, and the method of remedying it was by spinning metal along the shoulder of the jar by gradually applied pressure—a slow and tedious operation—which resulted in a thin, close-fitting edge. In the original patent no means of removal was proposed, and Berthoud recognized the difficulty and danger involved in removing this spun flange from the glass, and about a year after amended his patent by filing a certificate of addition, wherein he provided a means of opening it:

"Cette disposition pour produire l'ouverture est d'une importance aussi grande que le bouchage lui-même, car à son defaut il était difficile, dangereux même, d'ouvrir un flacon qui ne presente pas l'assiette d'une boite de conserves. L'outil dont on se servait pouvant glisser et être la cause d'une blessure pour celui procedant à cette ouverture."

The method suggested by him was a strip or tongue extending from the flange, of sufficient length to enable it to be rolled up on

a key or similar device; thus tearing the tin so as to rupture the cap and admit a knife or other sharp instrument to work it off. This expedient was seen to be a slow and tedious operation, involving the tearing of the cap to pieces.  So the patentee filed another amendment later, proposing another scheme for removing the cap.  This consisted in soldering a horizontal band to the blank of metal which formed the lid, and setting this horizontal band under the bead of the neck of the bottle, making it longer than the circumference of the cap, so that an end or tongue was left, by which it could be unwound, tearing it from the solder, and the cap was thereby released.  Gedge, the English solicitor of Berthoud, took out the English patent June 21, 1878.  Nothing operating upon the plan of Berthoud seems to have been used in this country. Judge Townsend, who heard the case on circuit, discussed at length and points out the fundamental differences between Painter's and the Berthoud-Gedge patents.  We can add nothing to his critical analysis, and agree with his conclusion that "the two devices were radically different in conception, construction, function, and result."

(4)  The Thompson English patent for an improvement in metal boxes cr receptacles for holding alimentary and other substances. This device is in a different art.  The two engaging elements are of the same material (metal), and the problem of uniting metal with glass was not present.  The closure is effected by the smooth, flaring surface of the lid, conforming to the corresponding beveled surface of the metallic box.  There is no sealing disk, or anything resembling it.  In fact, a sealing disk would be impossible, without destroying the tightness of the contact in the surfaces which the patent was designed to secure.  There is no bending of the lid, for this would distort it, and manifestly the purpose was to use the same lid more than once.  Both box and lid being of flexible metal, the corresponding beveled surfaces were wedged together. These boxes, as stated in the patent, were for holding alimentary and other substances, and there is no suggestion that they have been used or could be used for bottling gaseous liquids—the purpose which Painter sought.

(5)  The Goulding patent of July 9, 1899, which is referred to in the opinion as a "bottle stopper."  In his specifications, Goulding says, "This invention has for its object to provide a simple and durable device for securing corks in bottles;" and again, "The invention consists of a cork holder made of elastic metal."  This correctly describes the invention, which did not profess to provide a substitute for the old system of stopping bottles with corks.  He sought to supply a device that would take the place of the old wire caging as a retainer of the cork.  It is nothing more than a spring latch for holding the cork in its place.  In the drawings illustrating the patent, this holder is made of a top plate of stiff sheet metal, with depending arms, corrugated longitudinally, bent at their lower ends to form fingers, which engage the shoulder of the bottle neck. This holder is removed by pushing the same laterally from the enlargement of the neck of the bottle.  The Goulding patent was

before the examiner of the Patent Office, as the record shows, and certain of Painter's claims were rejected on it; but on appeal to the examiners in chief they reversed the first examiner, using this language:

"But Goulding has no sealing disk, and no 'flange encircling the disk,' but a cap with elastic pendant fingers in place of the continuous flange of hard or nonelastic metal; such fingers being formed and bent before being put into engagement with the shoulder, and, of course, only adapted for use on bottles where the distance between the top and shoulder is predetermined and uniform, and is not, like applicant's design, adapted to be bent into engagement with the shoulder in the act of forcing it into position on the bottle, whatever the distance between such parts, as bottles are ordinarily constructed."

And on further appeal on other grounds to the Commissioner of Patents, he says:

"I agree with the examiners in chief that the Goulding patent does not constitute an anticipation."

It is not a bottle-stopping device at all, and the testimony of all the witnesses who were examined is that nothing operating on Goulding's plan could be used for any purpose in Painter's plan, and, so far as these witnesses knew, it had never gone into use for any purpose.

We have reviewed all the patents cited by the court of the Second Circuit as showing the prior art, and have carefully examined all of the patents in the record—especially McBane's and Poole's English patents and the German patent of Rademacher. They seem to us to show nothing more than that there were in the prior art certain elements which could be combined to produce the result which Painter attained. There is no proof or suggestion, even, that they ever were so combined. While some of the elements were found in one patent, and some in another, in not one were they in the same relation, or organized or operated on the same principle, or corresponding either in terms or in substance to any of the claims of the Painter patent. No mechanical skill applied to any one of them would convert it into anything analogous to Painter's devices, or having any analogous capacity. Not one of these devices, ingenious as some of them are, had ever been used or could be used for the purpose of the Painter invention, without departing from the respective plans inherent therein. It would involve substitution and reconstruction to convert any of them into the Painter plan. The law does not allow mere mechanical skill to usurp the place of invention, which involves higher thought, and brings different faculties into activity. It will not allow one to take from the public that which the public already has, or grant the exclusive privilege which the patent confers without consideration. It therefore is the duty of courts, which, in the last analysis, are the guardians of the public interest, to scrutinize with care every attempt to establish the monopoly which the patent gives, to examine the state of the art, and to see if the idea expressed in the invention has ever been communicated to the public, and was in such a stage of development in a prior patent that a skilled mechanic, working upon the plan or principle therein suggested, could by mechani-

cal means attain the result which the patentee attains. To constitute anticipation the previous patent should not only suggest the idea, but indicate the means and essential elements so distinctly that a mechanic versed in the art, in the light of the patent and of the state of the art at the time the same was granted, and not in the light of subsequent discoveries, could make, construct, and practice the invention without the exercise of his own inventive skill. The fact of discovery is often ascertained by results, and while it may be difficult for us to put our finger upon any precise thing in Painter's device, and say that Painter invented that, we find in the results a substantial addition of our stock of knowledge— a mode of application of simple forces embodied in an instrumentality so simple that our wonder is that it was not done before. Its very simplicity tends to raise a doubt whether the inventive faculty was needed to produce results which seem so obvious that we are prone to think that any mechanic, starting where Painter did, and with the knowledge of previous inventions which he had, could by mere mechanical skill accomplish what he did. The fact that no mechanic did accomplish it, although many inventors were eagerly trying to do so, and the world as eagerly awaiting a simple and cheap bottle-stopper device, if not conclusive proof, is very persuasive evidence, that something more than mechanical skill was required; that it demanded inventive genius or faculty to bridge the chasm which separated the bungling, imperfect, inoperative devices of previous inventors, and the simple, economical, and, for its purposes, perfect, device which Painter gave to the world. If the subject-matter was of little importance and of merely transient interest, we might say that mechanical skill did not accomplish it, because it did not make the effort; but if it was a matter of enduring importance, and promised great profit if the problem was successfully solved, it is safe to assume that there was great likelihood of some mechanic applying his skill, if success could have been readily achieved by merely mechanical means. In its opinions (Crown Cork & Seal Co. v. Aluminum Stopper Co., 108 Fed. 863, 48 C. C. A. 72; Farmers' Mfg. Co. v. Spruks Mfg. Co., 127 Fed. 691, 62 C. C. A. 447), this court has cited the decisions of the Supreme Court, and has stated the principles that govern patentability in cases where old elements had been combined to produce new results, and we will not lengthen this opinion by repeating what we then stated and still believe to be the correct rule. Where none of the prior inventors exhibits or suggests any co-operation of the elements upon the principle adopted by the patent in suit, or upon any principle adapted to serve the same purpose, the use of the old elements may limit, but cannot defeat, the patent.

There was a great demand for some method of stopping bottles, more convenient and economical than the long corks which had always been used for that purpose, but the testimony shows that there was practically no other closure for bottles containing effervescent liquids in general use prior to Painter's invention. The history of the art shows various ineffectual schemes by which other inventors failed to accomplish what he successfully accomplished.

It may be observed that none of the patents cited in the opinion of the Second Circuit were designed to secure a closure of bottles containing charged liquids generating aggressive internal pressure; unless Goulding's be so considered. His corkholder was designed to retain the cork which would so resist, but those were intended for sealing food products, fruits, etc. McBane's English patent was for a spring clip, with a crown and a number of vertical arms, intended to secure a cork or other stopper. There may be found, too, in the prior art, a stopper of rubber, hung upon a sort of hinge. McBane used a sealing disk. Poole, Rademacher, and Goulding used a shouldered bottle, and Whittlesey exhibits a corrugated flange. The finding in the old devices, one portion here, one in another, and so on, should not defeat a patent for the combination, which is only truly anticipated by a prior device having identically the same elements, or their mechanical equivalents, co-operating to produce the same results. Even if any of them nearly approached the complete invention, if they were not operative or available there would be the presumption that they were not identical with one of admitted superiority, the merits and utility of which are proved by general use. Granting that the elements were known, something before unknown had to become known. A new operative means had to be devised, by which what was known could be made available, and a creative or inventive faculty had to be invoked and exercised to discover the availability of a mode of application by which forces already known could be so united as to effect results desired, and theretofore sought in vain. The unknown and untried factors had to be united with the known factors, and the combination of these elements into a practical, operative means, and its embodiment into a concrete thing, constitute invention. There is always a presumption of novelty, arising from the patent itself, greater or less, according to circumstances. If the patent relates to something of temporary interest, and the object sought is of little importance, and offers but slight chance of profitable use, it may receive but little attention in the Patent Office, and the presumption therefore is slight; but where the problem sought to be solved by the patent is of such importance that the solution of it promises great pecuniary returns, and the testimony shows, as it does in this case, that all the claims of the patent were subject to critical analysis by trained experts in that office, resulting in amendments and disclaimers designed to distinguish it from everything in the prior art, and the subject appears to have been thoroughly threshed out, the presumption in favor of novelty is greater than in those cases where the patent may have passed by inadvertence.

"Almost all inventions at this day," says Judge Blatchford in Crandal v. Walters (C. C.) 9 Fed. 659, "that become the subject of patents, are the embodiment and adaptation of mechanical appliances that are old. In that consists invention." Doubtless Painter may have profited by the experiments and ideas of others, and by their failures, and if he was aided by the suggestions and information of others, of such definite and clear character that nothing but

manual skill was needed (something which did not require thought, but simply the dexterity of a skilled mechanic, which, working upon the plan suggested in the previous patent, produced better results only by reason of his superior dexterity), then he could not claim to be an inventor; but if, knowing all that others had done or suggested, there still remained something necessary to complete it (something that his own skill and ingenuity had to devise to make a complete and perfect success); if he reorganized an old plan, based upon wrong principles, and rendered it successful; if he discovered a new application of an old force, supplying a hitherto unsatisfied want by a method essentially distinct from any previously known—he ought not to be deprived of the benefit of his labors. The law cannot take account of or draw a line which separates ideas generated in the mind of the inventor and those ideas which have come to him from external observation. It is difficult, too, to draw a line of distinction between the work of an inventor, the result of his ingenuity and the exercise of his thought, and the work merely of a skillful mechanic or adapter, whose merely imitative faculties attain the sought-for end. It must be remembered that the object which Painter sought was one which was apparent almost from the beginning of time; it was an object which, if attained, promised great rewards; and therefore it is to be presumed that others were seeking the same end, alert to take advantage of any ideas that were afloat; and, if mere mechanical skill was all that was needed, it would be strange that some mechanic had not adapted these ideas before Painter did, and accomplished the same result, but confessedly no one did. That fact raises a presumption that something more than mechanical skill was needed. Considering the simple nature of his invention, it may seem strange that it so long eluded others, and baffled the skill of previous inventors. His idea may have been but a slight step in advance, but, if it was something really novel, he is entitled to the benefit of it. The intrinsic novelty and utility of Painter's concrete invention cannot be disputed; using the word "novelty" in its popular sense, as meaning something altogether new as a contrivance for stopping bottles. It is different from any other method and an improvement on any other method. "A patented improvement," says Justice Clifford in Union Sugar Refinery v. Mathiesson & Co., 3 Cliff. 639, Fed. Cas. No. 14,399, "consisting of old elements, cannot be proved to be invalid by showing some one of the elements in some prior machine, and another in another prior machine, until it is shown that all the elements which constitute the improvement were in prior use, because the theory of such a patent is that the elements are old, and the invention consists in a new combination, whereby a new and useful result is obtained." Where there is an actual and admitted improvement, and its utility is shown in a marked degree, there should be controlling reasons to rebut the presumption that there is sufficiency of invention to support the patent. "Its comparative utility—the superiority of its operation over all the existing methods of accomplishing the same result—may be so great

139 F.—21

as to furnish conclusive proof that the invention is radically different from all preceding arts or instruments, and that, though it is imperceptible, some new force or new application or new object must have been discovered by the inventor. If, therefore, in its operation the concrete invention attains the desired end with greater economy of time, material, or labor—if it avoids difficulties hitherto encountered, and thus becomes an agency more valuable and effective than any previously known—the degree of this increase in value and effectiveness may be, though it not always is, sufficient to demonstrate that the invention is new, and hence that some new factor must have been discovered, and the creative powers have been employed." Robinson on Patents, § 116, citing Smith v. Goodyear Dental Vulcanite Co., 93 U. S. 486, 23 L. Ed. 952, and other cases.

There is a suggestion in the opinion of the court of Second Circuit that the success of the crown seal is largely attributable to the machine used for putting the caps on the bottles. If it be true, as we think the testimony incontestably shows, that prior to Painter the well-nigh universal method of stopping bottles was the long cork or stopper of some resilient substance, held in place, where gaseous liquids created internal pressure, by a wire caging, or some other device analogous to Goulding's, and that Painter's devices were the first which dispensed with the long cork or stopper and the wire caging by substituting a simple and economical cap, whose utility and efficiency are undisputed, and that this cap is the best now or ever used, we cannot see that there is any reason to deny patentability to the invention of the cap because Painter contemporaneously invented a machine especially adapted to its convenient and effective application. That rather furnishes a reason for giving him protection in both.

Our conclusion is that Painter's patent is valid.

We come now to the consideration of the main question made by this appeal. There are 39 assignments of error. We need consider only those that relate to the subject of infringement.

In sustaining the validity of Painter's patent, we have said that the state of the art may sometimes be found to limit, although it may not defeat, the patent, and this case seems to illustrate that rule. The visual resemblance of the defendants' device to Painter's is so great that at first impression it seems a servile imitation, but, as we pointed out in the case of the Whittlesey cap, mere resemblance does not necessarily imply identity. The vice of our first impression and the error in the decree below seem to lie in the tacit assumption that the whole device embodied in the crown seal was the invention of Painter, without separating the old from the new, and defining the precise extent of Painter's improvement. The astute use of the doctrine of equivalents by the very ingenious experts of the plaintiff and the uncommonly able and earnest arguments of plaintiff's counsel were well calculated to lead to the conclusion that if the same result was produced by the use of the same elements, and embodied in a device which seemed to be the

same, it would necessarily follow that defendants' combination was identical with plaintiff's.

Painter's patent was sustained as a combination of elements, none of them new or his own exclusive property. His invention implied some modification of each part of the individual functions of the old elements, and such a co-ordination as to constitute a common function. He cannot prevent others from using the same elements, provided they are co-ordinated in a different way. "Identity of end" (Robinson on Pat. § 117) "is no proof of identity of means. Though an alleged invention may have no other ends than have already been obtained by using other arts or instruments, the idea of means which it embodies may still be new, and a true product of creative skill." There are many roads that lead to the same place. Painter cannot confine the public to the use of his road only. He has no legal or moral right to prohibit others from inventing other means to produce the same result. All that he can prevent is that others shall not produce the same effect by means substantially identical with his, by a mere colorable imitation. In Pitts v. Wemple, 5 Fish. Pat. Cas. 10, Fed. Cas. No. 11,194, Drummond, J., says:

"After a patent has been obtained for a particular thing by one person, another person, without appropriating that patent, may invent a new mode of accomplishing the same or a similar object, and the latter will be entitled to a patent for his discovery."

And the Supreme Court, in Fuller v. Yentzer, 94 U. S. 296, 24 L. Ed. 103, referring to a case of invention that consists merely in a new combination, says:

"A suit for infringement cannot be maintained against a party who constructs or uses a substantially different combination, even though it includes the same exact elements or ingredients."

See, also, Electric Signal Co. v. Hall, 114 U. S. 96, 5 Sup. Ct. 1069, 29 L. Ed. 96.

To determine whether the means are identical requires a more critical examination of Painter's patent than we have yet given. We must look to the claims and the description in the patent, for Painter must abide by the claims and description found there. The comparison is not between the two concrete inventions, but between the alleged infringing combinations and the description and claims of the patent. Each element of the combination so described in the claim is thereby made an essential feature, and cannot be repudiated by the patentee, whether necessary to the performance of its functions or not. Each element being one of the operative means, identity depends not merely upon the function performed, but upon the manner in which it is performed. The alleged infringer does not infringe if he omits one of the elements which the patentee has described as essential. He does not infringe if he uses any number of the parts less than the whole.

It would extend this opinion to an intolerable length if we recited the whole of Painter's description and claims, and the points that have impressed us as important, we hope, may be made intelligible

by contrasting the various elements of the respective combinations.

The alleged infringing device is shown in Abbott's patent, No. 704,167, applied for February 6, 1902, and issued July 8, 1902. The defendants own several other patents, but by stipulation the exhibits offered in proof of infringement were made in accordance with this later patent, which, although not issued at the time of the commencement of this suit, was then pending in the Patent Office. This device is a paper-lined, sheet-metal sealing cap, with a metallic crown, and integral, pendant, annular flange, with longitudinal crimps or corrugations, and an adherent paper lining; the flange retaining a smooth interior surface. The disk in the crown of the cap is of cotton duck. This cap, as described, is to be used on a bottle with a tapered neck; the sealing operation being effected by pressing the cap on the top of the bottle, and the compression of the flange circumferentially around the tapered neck by a clamping device patented by Abbott and Brass; the essential features being the frictional hold of the smooth, paper-lined cap, compressed and lying against the neck of the bottle in such a way as to exclude all air. As we have repeatedly said in discussing Painter's patent, all of the elements used by him were old. Poole, Rademacher, and Goulding and others used a bottle with a shoulder, McBane and others used a sealing disk, and Whittlesey exhibits a corrugated flange. The general rule is that every patent is to be read as if the whole state of the art is written on its face, and in considering patents for a combination, it is to be remembered that the alleged infringer has equal rights with the prior patentee to the use of every element known in the art at the time when the first patent was issued.

(1) The bottle element is different. Painter says:

"The head of a bottle adapted to use with my caps may be varied in form, but it must have at a proper distance below the top of the bottle or lip an annular engaging shoulder. The location of this annular shoulder with reference to the top or lip of the bottle is a matter of material consequence."

He does not claim to have invented this style of bottle head, but it is a "matter of material consequence" that at a proper distance below the lip of the bottle there should be a shoulder, because the lower edge of the flange which contains the sealing cap is locked under this shoulder. The bending of the flange under the shoulder is an essential feature of his combination. This bending or locking alone holds the cap on the bottle head. No other means of holding the cap is suggested in the combination; hence the material importance, as he describes it, of having a shoulder at a proper distance from the top of the bottle. The defendants' bottle head has a plain surface and tapering neck. It is an inverted frustum of a cone. Merely as bottles, they are obviously dissimilar. On looking at defendants' bottle no one would say that it had a shoulder, but plaintiffs contend that functionally it is a shouldered bottle, because the neck has a greater diameter at the top than it has below. The dictionaries give us various definitions of the word "shoulder"—some literal, some figurative. None of these definitions

describe the top of anything as a shoulder. One of the definitions in the Century Dictionary is "a prominent or projecting part below the top." A man's shoulder is certainly below the top of his head, and it seems to us that it would be a straining of the word beyond its natural meaning to define the top of defendants' bottle as a shoulder because its diameter is wider than the neck lower down. Certainly it is not a shoulder in the sense in which Painter used the word when he said that it was of material consequence that there should be a shoulder at a proper distance below the top of the bottle. A greater width at the top than below cannot answer that purpose.

(2) The sealing disk is different. While Painter describes various forms of sealing disks, and expresses a preference for "the flat linoleum disk, composed of granulated woody matter and a practically tasteless and odorless gum," he makes no claim for any special sealing disk, but the law of his construction requires a resiliently compressible disk. The disk actually used is of cork, about one-ninth of an inch thick, fitting snugly within the cap, and filling it to about one-third the depth of the flange. It is this disk that effects the closure of the bottle and makes the hermetical seal; and the principle of construction requires that it should have a certain degree of thickness, which enables it to be compressed vertically and to exert a vertical resiliency. It is pressed down in the bottle mouth when the cap is fitted on, and locked under the overhanging shoulder, and its resilient qualities exert a pressure upward, necessarily, and by that pressure upward the locked arms of the pendant flange under the shoulder are kept tight and close. The sealing disk of the defendants has none or few of the qualities of Painter's. It is true that both are used to close a bottle mouth, but they do not perform it in the same way. The defendants' disk is of paper or cotton duck. There is an inherent difference between that and a compressible cork disk. The defendants' has no resilient compressibility. Such a disk is inconsistent with the defendants' plan of closure. In Painter's plan the disk must be compressed, and the bottle mouth closure perfected, before the cap is bent under the shoulder of the bottle, for this cap is designed to maintain the closure previously effected. One of the exhibits in the case shows a bottle after Painter's plan, and one of his cork disks in sealing relation to the bottle mouth, held there by wire fastenings, and the closure is precisely the same as that effected by the cap when bent around the shoulder of the bottle. This shows clearly that the closure effected by Painter's plan is due to the disk. Defendants' disk cannot be held to be substantially identical with Painter's. Composed, as it is, of a thin piece of paper or cotton duck, it is not resiliently compressible, as Painter's is. It does not perform the same function in the same way. By itself it could not effect an efficient closure of the bottle mouth. The constructive principle of Painter's device is that the cap is a disk holder. The essence of the defendants' seal is that it dispensed with any like sealing disk by creating a mechanical union of the metal cap with a coextensive paper lining, leaving the paper interior of the

cap perfectly smooth; and this concrete unit, by being compressed against the smooth, cone-shaped neck, became by the one operation a closure of the mouth of the bottle and a firm fastening.

(3) Painter points out in his specifications that the inner ridges formed by the corrugations of the flange are left exposed, and capable of operating, when bent, as locking ribs. They are not mashed in the bending process, but are left intact. The radial line of the bending is about midway of the flange in Painter's device, the disks occupying about one-third of the upper half of the cap; and, although he speaks of the corrugations as extending substantially throughout the depth of the flange, it is plain that there is no need of corrugations throughout about one-half of the upper part which incloses the disk. The special function of the corrugations in his device, outside of the admittedly old office of stiffening and cushioning, is that the inner ridges, when bent under the shoulder, shall closely embrace it, while the outer ridges form a projected edge for the opening tool. He repeatedly lays stress upon these well-defined ridges, which maintain their character as corrugations after they are bent under the shoulder; a deformation and reformation taking place as the flange is bent inwardly to grip the overhang of the bottle. The contents of the file wrapper explain the essence of the device, and, in differentiating it from prior devices, in order to obtain the patent, contain certain controlling limitations, which operate as an estoppel against the patentee. Therein the sealing disk is referred to as "necessarily quite compressible," and this disk, being confined by the cap which peripherally encircles it, is made under pressure to not only evenly conform to the annular edge or lip of the bottle, but also to follow downwardly, and to lie in close packing contact with the outer surface of the bottle below its mouth. In the explanatory argument the disk is referred to as "applied under great pressure—sometimes several hundred pounds—and this pressure must therefore be retained for long periods of time throughout the annular line of the lip. This can only be done by a flange bending into locking contact with an annular shoulder." The disk, therefore, which is to accord with his specifications must be essentially one which is expansive, and needing peripheral restraint under vertical compression. It seems to us that he is estopped, therefore, from complaining that a disk of cotton duck meets the claims of his combination. The defendants' disk of cotton duck, although a form of packing well known in the art, has no resilient compressibility, which is the essential characteristic of Painter's disk. The decision of the board of appeals, allowing the fourth and fifth claims, overruling the examiner, who held that Goulding had anticipated them, shows that they regarded the vertical compressibility of the disk, and its resiliency under such compression, and the consequent variableness in the distance between the top of the disk resting on the lip, and the annular shoulder of the bottle beneath it, as important, because it says that Goulding's plan "is adapted for use on bottles where the distance between the top and shoulder is predetermined and uniform, and is not, like applicant's design, adapted to be bent into

engagement with the shoulder in the act of forcing it into position on the bottle, whatever the distance between said parts, as bottles are ordinarily constructed." It is manifest from this ruling that if Painter's disk had been a mere inert piece of paper or cotton duck, not resiliently compressible, this differentiation between Goulding and Painter could not have occurred.

(4) In the argument of Painter's attorney on the appeal from the examiners in chief, which rejected the first claim, great stress is laid upon the projected edge which affords an engaging surface for the bottle opener. That feature is pressed as essential, and as distinguishing it from Butler's patent, which had no such projected edge; and he says, "Although the cap is in firm locking contact with the engaging shoulder on the head of the bottle, the edge of the flange is in a projected position, because it is practically intact, the locking of it being wholly independent of the edge of the flange," and quotes from Painter's specifications, where he says, "By my improvement in the construction with the cap they can be readily secured in place, after being once put in position, by simply turning the lower edge of the flange." A construction such as the defendants', whereby the lower edge of the flange is pressed into close contact with the smooth surface of the bottle, and not bent under a shoulder, certainly does not seem to meet this claim of Painter's combination.

At the risk of some repetition, we will now sum up the distinction between the two devices: Both start out to accomplish the same end. In each there is a metal cap with corrugated flanges. Neither has any exclusive right to such metal cap, for it is old in the art. In Painter's the closure of the bottle mouth is effected by a resiliently compressible disk. That which is actually used is a disk of cork, about one-ninth of an inch in thickness, but he is not confined to the use of cork. It is of the essence, though, of Painter's disk, that it should be of a yielding nature, and when under compression should exert a constant upward push, else the seal is broken, for the cap element in itself merely holds the seal in its place, and can effect no seal without it. In the defendants' device the disk is a fabric washer—an inert cotton duck or paper. It has not the identifying characteristics of Painter's. It is not resiliently compressible, because the scheme of defendants' structure does not require the disk to exert any pressure upward against the top of the cap, as Painter does. There is such an inherent physical difference betwen the two that they cannot be said to be substantially identical. The corrugations in Painter's and defendants' plan perform each certain functions common in the metal workers' art—of giving stiffness, acting as cushion, and allowing the surplus metal when it is pressed circumferentially to be taken up in symmetrical folds instead of in irregular folds. There is no new office or new invention there, but in Painter's the new office performed and the operative principle (and that is one of the essential features of his combination) is that the inner ridges are bent under and conform to the shoulder, while the outer ridges form the projected edge for the opening tool to engage. This bending un-

der the shoulder locks the cap on the bottle, and the upward pull of the compressed disk holds it in locking relation. In defendants' device the new function and operative principle of the corrugations of the flange are that the inner ridges are driven into the paper lining of the cap far enough to mechanically connect the metal and the lining; leaving a perfectly smooth interior paper surface, capable of making a close seal with the smooth glass surface of the bottle neck. As ridges they perform no function whatever, and when compressed the ridges disappear, and are mashed smooth against the bottle neck. In Painter's the lower edge of the flange is bent under the shoulder so as to form a hook. In defendants' there is no bending of the flange at all, in the sense of curving, making crooked, or deflecting from the normal condition of straightness, which is one of the definitions of bending. It is compressed against the smooth glass surface of the tapered or cone-shaped bottle neck. The principle of the defendants' construction is to press the smooth, paper-lined interior of the cap into close contact throughout with the conical neck of the bottle, giving it a frictional hold. Any bending will defeat the principle. Painter's principle, on the other hand, is not to give a frictional hold, but a fixed hold, by locking the ridges of the corrugated flange under the overhanging shoulder. In this operation the angle of the lower part of the flange is changed; in defendants', the angle of the lower part of the flange in its relation to the cap is the same as the upper part, thus showing that it is not bent. It cannot, therefore, be said that the corrugations in the two devices perform substantially the same functions. Thus it is seen that there are two separate and distinct elemental features in Painter's device, each performing its separate and distinct function: (1) A sealing of the bottle mouth by a compressible disk; (2) a locking of this disk which effects the closure by the bending of the flange under the shoulder; while defendants', in creating a mechanical union of the metal cap and its coextensive smooth paper lining, produces a device which, being compressed against the smooth, cone-shaped neck by one means and one operation, effects a hermetic seal firmly fastened on the bottle neck.

As we have already said, each element of a combination as described and claimed is thereby made an essential feature, and one of the operative means, and cannot be repudiated by the patentee. So, when Painter said that the shoulder must be a certain distance below the mouth of the bottle, and that there must be a resiliently compressible disk, he cannot be heard now, after another invention has taught how they may be dispensed with, to say that neither of these features is essential. Identity depends not merely upon the function performed, but upon the manner in which it is performed, and the supposed infringer does not infringe if he omits any of the elements which the patentee has described as essential; nor is he permitted to block the path of improvement or invention by claiming matters unessential. Though the same results are produced by the same elements, there is no identity if they are arranged under a different co-operative law. To constitute infringement,

they must coact upon each other in the same way to produce the common object. The inventive skill may seem small, and the change trifling, the result of accident or happy thought, yet, if there is some inventive element in the mind, the conception of some idea not previously present, however short may have been the duration of the mental process that invoked it, if the inventor embodies the idea in some tangible form, operating upon a different principle, he is entitled to protection, without regard to the comparative excellence, or otherwise, of his device.

Interchangeability or noninterchangeability is an important test on an issue of infringement, for, as a general rule, like results are produced by like means. The plaintiff, recognizing this rule, has offered testimony to show that the two caps are interchangeable. Without going into details which would necessitate too much repetition, we may say that the proofs are not convincing. "Seldom, if ever, in the material world, does any effect rest so exclusively upon a single cause that no other operation of natural or artificial forces could produce the same result. Identity of end is therefore no proof of identity of means. Though an alleged invention achieves no other ends than have already been obtained by using other arts or instruments, the idea of means which it embodies may still be new, and a true product of creative skill." 1 Robinson, § 117.

In sustaining the validity of Painter's patent, we referred to the principle, which is well settled, that the grant of a patent is prima facie evidence of patentable novelty. The same principle may be invoked in behalf of defendants. Painter's patent is specifically referred to in Abbott's application, and the Patent Office had before it Painter's and all the other patents showing the state of the art when the patent was granted. It was designed to accomplish the same functions as Painter's, and on its face it discloses and claims a substantial difference, and could not have been consistently granted if it were substantially the same as Painter's. The grant of it therefore must be considered as expert evidence, of high and impartial character, of nonidentity, and raises a fair presumption of patentable difference in its favor, which requires strong evidence to overcome. We are not satisfied that the plaintiffs have succeeded in so doing, and, in our opinion, there has been no infringement.

It follows, therefore, that the judgment of the court below should be reversed, and the case remanded, with directions to dismiss the bill.

Reversed.

GOFF, Circuit Judge. I find no error in the decree complained of, and I dissent from the judgment of this court that reverses it.