ROOT REFINING CO. v. UNIVERSAL OIL
PRODUCTS CO. (two cases).*
Nos. 5546, 5648.

Circuit Court of Appeals, Third Circuit.
June 26, 1935.

Rehearing Denied Aug. 6, 1935.

Arthur C. Denison, of Cleveland, Ohio, J. Bernhard Thiess and Thorley Von Holst, both of Chicago, Ill. (Arthur G. Logan, of Wilmington, Del., of counsel), for appellant.

Thomas G. Haight, of Jersey City, N. J., Wm. F. Hall, of Washington, D. C., Hugh M. Morris, of Wilmington, Del., and Chas. M. Thomas, of Washington, D. C., for appellee.

.Before BUFFINGTON, DAVIS, and THOMPSON, Circuit Judges.

DAVIS, Circuit Judge.

These suits were brought against the Root Refining Company by the Universal Oil Products Company, hereinafter called plaintiff, for the infringement of all the nine claims, except the sixth, of United States letters patent No. 1,392,629 issued to Carbon P. Dubbs, October 4, 1921, and by him assigned to the plaintiff, and all five claims of United States letters patent No. 1,537,593 issued to Gustav Egloff, May 12, 1925. Each patent is for a process for the manufacture of gasoline from petroleum. The Root Refining Company defended on the ground that both patents were invalid; the Dubbs patent for lack of disclosure and the Egloff patent for lack of utility, and both for lack of novelty over the prior art. All the claims in issue were held to be valid and infringed by the learned District Judge. The two suits were consolidated for trial and will be disposed of in a single opinion here as they were below.

The Root Refining Company, hereinafter called defendant, is a Delaware corporation, and the plaintiff is a corporation of South Dakota.

Both patents relate to improvements in the process of cracking petroleum for making gasoline. Petroleum in its natural state, as it comes from the earth, is made up of many combinations of hydrogen and carbon. The natural constituents of these combinations are classified according to their specific gravity or boiling points.

Writ of certiorari denied 56 S. Ct. 149, 80 L. Ed. ——.

Cracking involves the decomposition of these complex hydrocarbon molecules of petroleum by the application of heat and pressure. It breaks up the heavier constituent elements and converts them into lighter oils such as incondensable gases, gasoline, kerosene, gas oil, and fuel oil. As the heavy hydrocarbon compounds composing the oil to be refined are broken down, new ones are formed. Some of these contain a great number of valuable hydrogen elements while others contain more carbon compounds which have little or no value.

Cracking, as distinguished from distillation, which involves the mere physical separation of the elements of the oil, involves a chemical reaction. This is produced by the application of intense heat, 700° to 850° F. and upward, for a sufficient length of time to break up the molecules. The art of cracking is of great advantage, for it is said to save more than 500,000,000 barrels of oil yearly.

The historical development of cracking oil to the state of the art where Trumble left it was admirably set forth by Judge Woolley in the case of Skelly Oil Co. v. Universal Oil Products Co. (C. C. A.) 31 F.(2d) 427, 429. What Trumble did was to take a typical cycle system, well known in the art, and "disclose a practice and suggest a means continuously to draw off a *small portion* of the revolving residuum (loaded with the objectionable matter) in each of its cycles through the closed system and replenish the bulk with an equal amount of new oil stock and thereby maintain the bulk constant in volume." This was held to be "something abruptly different from what existed before," and, utility being evident, the patent was held to be inventive and valid.

There are two real questions involved here: (1) The validity of the claims; and (2) their infringement, if valid.

Validity depends upon whether or not Dubbs and Egloff made any inventive advance in, or contribution to, the art over Trumble. If they did, what was it?

The refining industry according to the plaintiff recognizes three types of cracking processes: (1) The liquid phase, all the oil undergoing treatment being in a liquid condition in the zone where heating and cracking take place; (2) the liquid vapor or mixed phase; and, (3) the vapor phase, all the oil being converted into vapor before it reaches the heating and cracking zone.

The Dubbs patent practices the mixed phase process, in which all the heating is done in the heating or cracking coils. (Generation occurs in these coils, "but without substantial evaporation.") In the process of refining oil, carbon rapidly accumulates in large quantities upon the heating tubes of the still and causes serious difficulties and great expense. In the development of the art, carbon which thus formed on the inner walls of the heating tubes increased their temperature to such a degree that it became necessary to shut down the plant frequently in order to remove the carbon and to prevent the tubes from bursting. A still under the old Burton-Clark system, the best before Trumble, could not be operated for more than 36 hours before it had to be shut down. It required about the same length of time to clean the tubes, because many of them are in the furnace and are quite long, before another run could be started. After the still had been closed down and cleaned, a considerable length of time was required to heat the tubes again to a temperature sufficient for cracking.

The Trumble patent greatly increased the length of the run by removing part of the residue from which the vapor had been separated so that that part of the residue was never again returned to the cracking coil or tubes. This increased the run from 36 hours to 17 days.

In Dubbs' process the oil to be refined enters the still through a pump J in Fig. 2 and is forced into the "cracking tubes B" where it is heated to the proper temperature, the maximum which it ever attains in the system. It is then discharged into "vaporizing tubes C" which are only partially filled with oil, and as the oil is passing through these tubes the cracking reaction is completed and the vapors formed therein as well as the vapors generated in the B tubes separate themselves from the liquid oil and pass up through tubes D and E to the partial condenser, called a "header" G, thence to the aerial condenser G¹, and through the pipe G² to the final or water condenser G³, whence it is discharged through the pressure-regulating valve H. The condensate from the partial condenser G and G¹, large in amount and uncontaminated by the residue left in the vaporizing tubes, while still at a heated temperature, is discharged through pipes F F¹ into the

fresh feed line and this mixture composed of reflux and fresh feed under pressure of the high-pressure pump J is forced into the entrance of the cracking tubes B. The distillate from the final condenser $G^3$ is the desired product of the process. All the residue left in the tubes C from which the vapor has been separated is drawn off through the line K and the pressure regulating valve $H^1$, and is never again returned to the system.

Two things distinguish Dubbs from Trumble: (1) Dubbs returns a large amount of reflux uncontaminated, from the partial condensers G and $G^1$ to the entrance end of the cracking tubes, admixed with a charge of fresh oil. (2) He removes all of the residuum left in the vaporizing tubes so that none of it ever again enters into the system. He thus secures what the patent calls a continuous "clean circulation," free from carbon-producing residuum. Because Trumble removes only *some* of the residuum he does not secure a "clean circulation." This is admitted by counsel for appellant as a distinguishing feature between Trumble and Dubbs. He says that "a comparison between the Dubbs and Trumble operations shows that whereas Trumble withdraws a portion of the residuum, Dubbs withdraws all of it." Trumble thus circulates the residuum through the heating tubes over and over again, but Dubbs prevented the return to the cracking coils of any of the carbon which had been freed and also any of the "asphaltines" which are present in the oil which has once been subjected to cracking temperature, but not vaporized, and these, when again subjected to cracking temperature, rapidly turn into carbon and settle on the cracking tubes. "Trumble returned dirty and Dubbs clean reflux for cracking. There is the difference," said Judge Nields in his comprehensive opinion ([D. C.] 6 F. Supp. 763, 769).

This forward step by Dubbs, though simple as we look back upon it, produced astounding results

The maximum length of run under the Trumble process, using *gas oil* as a charging stock, was 17 days. The average run under the Dubbs process using *fuel oil*, a poorer grade of oil, was 25 to 40 days. The gasoline yield using the Trumble process was 28 per cent. to 30 per cent.; under the Dubbs process the yield was 47 per cent. to 52 per cent.

These advantages were so great and unmistakable that the whole industry immediately recognized them. The Royal Dutch Shell interests which owned the Trumble patent immediately took out a license under Dubbs and paid in royalties over $12,000,000, and later, in 1930, with the Standard Oil Company of California, which spent $5,000,000 in experimental work trying to solve the problem, purchased all of the stock of the plaintiff company, which owns the Dubbs patent, for $25,000,000. The licensed users of the process expended over $50,000,000 in apparatus for practicing it and paid appellees in royalties in a period of seven years a sum in excess of $33,500,000. It is improbable that shrewd and experienced businessmen, doubtless guided by able and competent counsel, would have paid such a price for an invalid patent.

Trumble was a distinct advance over the Burton-Clark process. We held that the Skelly Company infringed the Trumble process because it returned a dirty reflux and drew off only a part of the residuum which had once gone through the cracking tubes without being vaporized, but it did not infringe the Dubbs process because it did not return a clean reflux and did not draw off *all* the residuum. The Skelly Company could not have been sued at that time under the Dubbs patent, for it was not infringed. The Skelly Company followed the teaching of the Trumble patent and not that of Dubbs. Consequently, that suit was confined to the Trumble patent. The advance of Trumble over Burton-Clark and the prior art was pointed out and emphasized in the Skelly Oil suit. It was also brought out in that suit that the Trumble patent had been owned by the Dutch Shell Company and had been transferred to the plaintiff company, and that the Dutch Shell Company was then using the Dubbs process.

Does this apparently simple step forward taken by Dubbs constitute invention?

The efforts of the industry to avoid carbon in order to secure a longer run and the immediate adoption of the Dubbs process by practically the entire industry is conclusive evidence that Dubbs discovered what the industry had long been looking for, with only partial success in Trumble. It was an important step in advance of anything which had ever been done in the prior art. As Judge Nields aptly said, "A consideration of the prior art resolves

itself into the question whether Dubbs discloses patentable novelty over Trumble and Burton-Clark." In the Skelly Oil Case, supra, we passed upon the prior art up to and including Trumble. Of the five patents, Hall, Greenstreet, Alexander, Pielsticker, and Trumble, cited against Dubbs, the first three were pure paper patents, did not anticipate Dubbs, and had no effect whatever upon the industry which was earnestly seeking a solution to its problem of eliminating carbon and other deleterious substances. The words of Judge Buffington in the case of Hartford-Empire Co. v. Hazel-Atlas Glass Co. (C. C. A.) 59 F.(2d) 399, 413, are a good and sufficient commentary on these patents: "Where an art, eager for relief, found in these moribund patents nothing to meet that suggested solution, it is safer to rely evidentially on the then judgment, attitude, and conduct of the glass trade rather than on the post litem testimony of experts, the contentions of infringers, and the theoretical construction that often tempts courts to create out of lifeless patents an imaginary machine on paper which a working art could not do in steel."

◼ The British Pielsticker patent, with which the United States Pielsticker patent is substantially identical, belongs to the last century (1891), and, although it has always been available ever since it was granted, the District Court (6 F. Supp. 763, 769) said that "no one used it because it was useless." It appears to have been primarily intended for use in simple *distillation* of hydrocarbons and "fats and oils and the separation of fatty acids and glycerine." It also seems to have been intended for use in the distillation of water from sea water and alkaline solutions. Judge Nields said: "There is uncertainty as to what it discloses." It did not anticipate Trumble. It cannot by any interpretation short of mere inference anticipate Dubbs. From 1891 to 1921, the date of the issue of the Dubbs patent, a period of 30 years, nobody, not even the defendant itself (which paid royalties to plaintiff for five years, 1925 to 1930), thought that Pielsticker solved the problem of the industry or that he disclosed the process of Dubbs, and the change of mind of the defendant is not based upon disclosures, but upon inferences drawn from disclosure. What Judge Woolley said in the Skelly Oil Case, supra, applied here: "Inferences as distinguished from disclosures, especially when drawn in the light of after events, cannot be accepted as a basis of anticipation. A patent relied upon as an anticipation must itself speak. Its specification must give in substance the same knowledge and the same directions as the specification of the patent in suit. * * * It is not enough to prove that a method or apparatus described in an earlier specification can be made to produce this or that result."

◼ This well describes the position of the defendant in the case at bar. Knowledge after the event is always easy and problems once solved present no difficulties. Expert witnesses glibly testify that the new thing for which the world has been striving was always at hand and so easy of discovery that it required the merest mechanical skill to discover or produce it. But the law requires other tests of invention than subtle conjectures of what might have been discovered and yet was not. It regards a change as evidence of novelty. Degrees of change, dividing inventions into primary and secondary, give a proportionate dominion to a patent. A patentable invention may be the successor of all that went before and only a step beyond the prior art in the march of improvement. Diamond Rubber Co. v. Consolidated Rubber Tire Co., 220 U. S. 428, 31 S. Ct. 444, 55 L. Ed. 527.

In the Barbed Wire Patent Case (Washburn & Moen Mfg. Co. v. Beat 'Em All Barbed-Wire Co.), 143 U. S. 275, 12 S. Ct. 443, 446, 36 L. Ed. 154, the court said: "Under such circumstances courts have not been reluctant to sustain a patent to the man who has taken the final step which has turned a failure into a success. In the law of patents it is the last step that wins. It may be strange that, considering the important results obtained by Kelly in his patent, it did not occur to him to substitute a coiled wire in place of the diamond-shape prong; but evidently it did not; and to the man to whom it did, ought not to be denied the quality of inventor. There are many instances in the reported decisions of this court where a monopoly has been sustained in favor of the last of a series of inventors, all of whom were groping to attain a certain result, which only the last one of the number seemed able to grasp."

◼ In Eibel Process Co. v. Minnesota & Ontario Paper Co., 261 U. S. 45, 43 S. Ct.

322, 328, 67 L. Ed. 523, Eibel changed the machine only in the elevation of the breast roll and wire to produce a certain pitch or angle of the wire in relation to the horizontal. This change increased the speed of the wire from 500 to 600 feet a minute and produced a better paper. Chief Justice Taft, in sustaining the patent, said: "In administering the patent law, the court first looks into the art, to find what the real merit of the alleged discovery or invention is, and whether it has advanced the art substantially. If it has done so, then the court is liberal in its construction of the patent, to secure to the inventor the reward he deserves."

What Dubbs did now seems simple and just what any one skilled in the art would have done. "This, however, is but the common history of important inventions, the simplicity of which seems to the ordinary observer to preclude the possibility of their involving an exercise of the inventive faculty." Carnegie Steel Co. v. Cambria Iron Co., 185 U. S. 403, 22 S. Ct. 698, 709, 46 L. Ed. 968. "It is often difficult to determine whether a given improvement is a mere mechanical advance, or the result of the exercise of the creative faculty amounting to a meritorious invention. The fact that the invention seems simple after it is made does not determine the question. If this were the rule, many of the most beneficial patents would be stricken down." Expanded Metal Co. v. Bradford, 214 U. S. 366, 29 S. Ct. 652, 655, 53 L. Ed. 1034.

It may seem strange that Trumble, who went part of the way, did not go all the way and secure a "clean circulation" by returning uncontaminated reflux mixed with fresh oil to the entrance of the cracking tubes and by removing *all* of the residuum from the vaporizing tubes, but he did not and in consequence failed to obtain the wonderful results of Dubbs. It is, however, not surprising for the industry was spending millions of dollars to obtain that result and Dubbs alone did it.

When the principles declared in the above and many other cases are applied to the evidence in this case, the conclusion is irresistible that Dubbs made an important and novel disclosure which has been of great commercial use.

The Egloff patent, like the Dubbs patent, seeks by its process and apparatus to eliminate as far as possible the evils produced by carbon in the process of cracking oil. Claim 5, which is typical, is as follows: "A process of oil conversion, consisting in maintaining a body of heated hydrocarbons in an enlarged zone where substantial vaporization occurs, in subjecting the vapors to reflux condensation to condense the heavier vapors, in passing the reflux condensate in an advancing stream through a heating zone where it is subjected to cracking conditions of temperature and pressure, in delivering heated condensate to said enlarged zone, and simultaneously heating an independent stream of charging oil for delivery to said enlarged zone to a temperature sufficient to cause a substantial vaporization thereof in said zone, in introducing said heated charging oil to the enlarged zone, and in withdrawing unvaporized oil from said enlarged zone without permitting the same to again enter either of said oil streams."

The apparatus contains two heating coils, designated 5 and 6, in the single figure of the patent, heated to different temperatures, and many pipes suitable for the operation of the process. In this process oil is forced into pipe 7 on the inlet side of coil 5 by the pump, 8, and, when heated sufficiently to produce mild cracking, it passes through the transfer pipe 9 into chamber 12 where all the cracking is completed and vapor liberation occurs. The residue left from this liberation is discharged through the drawoff pipe 17 and is not again recirculated through the system. The liberated vapors pass through the pipe 19 into the dephlegmator where they are partially condensed. Those which are not condensed pass out through pipe 27 to the condenser 29 and finally into the receiver 33, from which the residue is drawn off through pipe 36. The reflux from the dephlegmator passes through pipe 23 which is connected with pipe 25 and through pipe 26 into coil 6. The oil is there heated to a higher temperature than in coil 5 and is then discharged through pipe 14 into pipe 9 where it mixes with the oil from coil 5 and this mixture is conveyed to chamber 12 and the process continues as before.

Judge Nields tersely summed up the Egloff patent as follows: "The Egloff process was designed to further mitigate the carbon evil in connection with the cracking of heavy oils. This process utilizes the salient features of the Dubbs patent. It provides a preliminary screening action for removing from the system the

free carbon and heavy polymers which rapidly snowball to coke."

Does the defendant infringe the Dubbs or Egloff process? Defendant's process is set forth in plate VIII in its brief and starts with the reflux line. Oil is conducted through this line and the reflux pump into furnace No. 2 where the temperature is raised to 900°F. under a pressure of 500 lbs. and 92 per cent. of the cracking takes place. In this furnace under heat and pressure vapors are produced; defendant calls this production "vaporization," while plaintiff calls it "generation." The oil in the form of a foamy mass leaves this furnace through a transfer line leading from the furnace to the "vapor separator" which corresponds to the C tubes of Dubbs. Before the heated oil enters the vapor separator the pressure is reduced to 29 lbs. through the pressure reduction valve in the line. Before the hydrocarbons enter the separator they are met by and mixed with a stream of "topped crude oil" raised to a temperature of 798° F. under an outlet pressure of 92 lbs. This mixed stream of oil from furnaces Nos. 1 and 2 enters the vapor separator and vaporization or vapor liberation takes place, just as it does in the C tubes of the Dubbs patent. The generated vapor goes off through the "vapor line" at the top to the "fractioning tower" and the residuum is drawn off at the bottom of the separator. From the top of the fractioning tower the product is removed and condensed and from the bottom the condensed vapors are returned as reflux to furnace No. 2, and the process continues as before.

All this is practically just what takes place in the Dubbs process described above, and any differences that exist are so slight that they are immaterial and do not affect the principle disclosed by Dubbs. But the defendant seeks to avoid the apparent conclusion as to infringement by an untenable construction of the words "without substantial vaporization" in the B tubes, found in one form or another (such as "but substantial vaporization prevented" or "while preventing substantial vaporization") in all of the claims of the Dubbs patent.

Claim 1, regarded as typical, reads as follows: "1. A process of converting relatively heavy into lighter hydrocarbons, consisting in passing a stream of oil through a zone where the oil is heated to a cracking temperature but *without substantial vaporization,* passed thence to and through a zone where vaporization takes place, removing the vapors, subjecting them to reflux condensation, returning reflux condensate, for further cracking, *removing the residue,* after said vaporization, from the system without permitting intermingling of any substantial portion thereof with the oil in the heating zone and maintaining a pressure upon the material during distillation."

The process has, as above stated, for its object the conversion of relatively heavy into lighter hydrocarbons by passing a stream of oil through the B tubes, where the oil is heated to a cracking temperature, but "without substantial vaporization." The oil then passes from these tubes to the C tubes where vaporization occurs. A great deal of testimony was taken as to what takes place in practicing the process of both the defendant and Dubbs. Defendant says that the construction of the phrase "without substantial vaporization" "is a matter of vital and, so far as infringement goes, controlling importance."

This is of importance as bearing upon the question of infringement for the reason that Dubbs says that the oil is heated to a cracking temperature in the B tubes, but "without substantial vaporization," while defendant says that in its operation 50 per cent. to 58 per cent. of the hydrocarbons are vaporized before leaving the cracking coil, or B tubes. If both parties mean the same thing by "vaporization," evidently the defendant does not infringe if the facts as to what occurs in the B tubes are correctly stated on both sides.

However, there is, as we see it, no room for dispute as to what occurs in the tubes, either B or C. The difficulty arises over the terminology used to describe what takes place while the oil is passing through them.

Plaintiff says that the words, "without substantial vaporization," as used in the patent, mean without substantial separation of the vapor from the liquid in the B tubes; that in the process of cracking, vapor is generated in the B tubes where there is formed a foaming mass of mixed liquid and vapor, but no "vaporization" occurs there in the sense that the vapor in any substantial quantity is liberated or separated from the liquid and this mixture of vapor and liquid travels at great velocity

towards the C tubes where the vapor is liberated from the liquid.

Dr. Warren K. Lewis, professor of chemical engineering at the Massachusetts Institute of Technology, testified for the plaintiff as follows:

"Q. 145. Doctor, is it proper to say that there is no *substantial vaporization* in the tubes B of the Dubbs patent in suit in practicing the process of that patent? A. Yes, in my opinion.

"Q. 146. Would there in those tubes be vapor *generation?* A. Yes, a very considerable amount.

"Q. 147. Would there in those tubes be both vapor *generation* and vapor *liberation?* A. No, there would be vapor *generation* only. * * *

"Q. 150. And in the tubes C would there be vapor *liberation?* A. Yes, all or at least substantially all of the vapor *liberation* occurring in the whole process occurs in tubes C. That is why they are called the vaporizing tubes.

"The Court: That word *'liberation'* means *separation* of vapor from the liquid?

"The Witness: Separation or segregation of vapor from the liquid. In my opinion that is the way it is used in the patent and I cannot read it any other way. * * *

"There is a large amount of vapor *formation* in the B tubes of Dubbs. Granting his operation, it is inevitable. Clearly, therefore, Dubbs is distinguishing between vapor *generation* and vapor *liberation.* Vapor *generation,* in Dubbs' mind, in my opinion, is the formation of vapor from the liquid, which is not accompanied by *separation* or *segregation* or *liberation* of that vapor from the liquid, resulting in its removal from contact with the liquid. In other words, I have referred to the physical condition of the liquid-vapor mixture, rushing and tearing through these B tubes, a spray, a froth, a spit, a foam. Vapor *generation?* Yes. Vapor *liberation?* No. * * *

"The process disclosed and described in this patent (the Dubbs patent in suit) is * * * characterized first by the fact that no *segregation* or *separation* of liquid from vapor is to be allowed to occur in the heating zone. * * *

"In the fourth place, it provides that there shall be no *liberation* of vapors in these tubes; that any vapors *generated* in these tubes shall travel through these tubes, commingled with the liquid in them in the form of a froth or a spray or intimate mixture without any *separation* or *segregation* or *liberation* of the vapors from the liquid."

Dubbs in his patent recognized the difference between the generation and the liberation of vapors. He distinguished between the cracking and vaporizing tubes. When he used the word "vaporization" he did not mean the *"generation"* but the *"liberation"* of vapor." He said: "B are the cracking tubes. C are the vaporizing tubes. D are the vapor tubes connected with the vaporizing tubes C." In his specification, he says: "Describing the operation of the process, the material to be treated is drawn from any suitable source by means of the pump J and discharge therefrom through line $J^1$ into and through tubes B and during the time they are passing through said tubes, they are subjected to sufficient heat to cause the desired amount of cracking. Said oil is then passed into the tubes C which are only partially filled with the oil and as the oil passes through these tubes, there is a liberation of vapors from same and which vapors pass up through the vapor tubes D, E and into header G and through aerial condenser $G^1$, through line $G^2$, through water condenser $G^3$ and discharged through pressure regulating valve H."

The art well knew that the cracking of oil by heat generates vapor in the B tubes, but pressure keeps it from separating from the liquid, and both the vapor and the liquid as a mixture rush on with great velocity into the C tubes which are only partially filled with the liquid, and, the pressure being released, the vapors separate from the liquid and thus vaporization, liberation of vapor, takes place. Or, in the words of the patentee, oil is "continuously supplied to the pump J and thence to the 4 inch coils B which are subjected to a temperature of 750° to 860° F. The heated oil then passes to the 10 inch coils C which are maintained about half full of oil and wherein vaporization takes place. The residue is constantly drawn off through the pipe K to a suitable storage. The vapors pass up through the line D to the pipe E into the manifold G and from thence into the aerial condenser $G^1$ where the heavier distillates are condensed and

the lighter distillates pass on to the water-cooled condenser G³." It is evident that when the patentee said that the oil was heated to a cracking temperature in the B tubes, but "without substantial vaporization,", he meant without substantial liberation of the vapor, for he says on page 2, lines 40–43, when the mixture enters the half-filled C tubes "vaporization" takes place. This word as here used means "liberation" of the generated vapor from the liquid, for after "vaporization" takes place in the C tubes, he says that the vapors pass up through the lines D to the pipe E, etc. On page 1, lines 78–84, in describing the process, he says: "Said oil is then passed into the tubes C which are only partially filled with the oil and as the oil passes through these tubes, there is a liberation of vapors from same and which vapors pass up through the vapor tubes D, E and into the header G." He thus defines "vaporization" by the words, "liberation of vapors." It is in this sense that "vaporization" is used in the claims.

Counsel for defendant, in describing what takes place in his process in furnace No. 2, which, as before stated, corresponds to the B tubes of Dubbs, says: "This reflux is conducted to the reflux pump, shown at the bottom of the drawing, from whence it passes to furnace No. 2. In this furnace 92% of the cracking of the system takes place. The oil courses through a coil having a serial length of thirty-four hundred and fifty feet. It is there raised to a temperature of 900° F under a pressure of 500 lbs. As cracking proceeds, substantial vaporization occurs to the extent of 50% to 58%. The hydrocarbons in this oil are converted into a foamy mass of mixed liquid and vapor traveling at a high velocity. As vaporization increases the velocity also increases owing to the expansion of the vapors. As the liquid and vapors are churned and mixed together in the form of a foamy mass, there is no possibility of separation of the one from the other. The hydrocarbons in the form of a foamy mass leave furnace No. 2 through the transfer line leading to the vapor separator. Before their entrance therein pressure is reduced to 29 lbs. through the pressure reduction valve in the line."

On page 9 of its reply brief defendant says: "The art consequently appreciated that when oil was heated in the coil (B tubes of Dubbs and furnace No. 2 of defendant) vaporization—that is, *vapor generation*—would occur unless sufficient pressure were used to prevent such vaporization."

Vaporization in these quotations means vapor generation.

In the last sentence of his reply brief, defendant again says: "Vapors form and multiply in defendant's coil and the conditions are such that there is no possibility of vapor liberation at any time."

On page 21 of his main brief counsel for defendant says: "The physical condition of the on-rushing stream of oil in these tubes (the B tubes of the Dubbs patent) would be such as to preclude the possibility of a condition where a tranquil liquid level could exist from which vapors might be *separated* and *liberated* from the liquid. * * * On the other hand, in the ten-inch C tubes of the patent, the velocity of the stream is greatly decreased. These C tubes are only partially filled thereby providing a liquid level from which *vapors generated* in the *cracking operation* are *released* and escape through the vapor lines D of the patent and through the vapor line from the top of the reaction chamber in the commercial operation."

Again, at the bottom of page 91 of defendant's main brief, it is said: "In view of the rapid velocity of the oil in the B tubes, liberation of vapors therein could certainly not exist at all, either substantially or unsubstantially."

Defendant's expert, Dr. Rittman, testified to the same effect:

"XQ. 862. In that vapor separator is there *liberation* of vapor from liquid? A. There is *separation* of vapor from liquid.

"XQ. 863. And is there *liberation?* A. Please define the word *liberation* as you mean it and I will try to answer it.

"XQ. 864. By liberation I would refer to the passage of vapors beyond the liquid, the vapors going on and leaving the liquid, and the liquid either remains where it is or is drawn out of the chamber where the liberation takes place. A. Therefore, I understand your term *vapor liberation to be the same as my vapor separation* and in that sense I would say there is *vapor liberation.*"

The words of the Supreme Court in the case of Smith v. Snow, 294 U. S. 1, 55 S. Ct. 279, 284, 79 L. Ed. ——, decided Janu-

ary 7, 1935, forcibly apply to the question of infringement in this case: "If the matter were doubtful, it is plain from what has been said that the character of the patent and its commercial and practical success are such as to entitle the inventor to broad claims and to a liberal construction of those which he has made. Morley Sewing Machine Co. v. Lancaster, 129 U. S. 263, 273–277, 9 S. Ct. 299, 32 L. Ed. 715; Eibel Process Co. v. Paper Co., 261 U. S. 45, 63, 43 S. Ct. 322, 67 L. Ed. 523; Winans v. Denmead, supra, 15 How. 330, 341, 14 L. Ed. 717. In such circumstances, if the claim were fairly susceptible of two constructions, that should be adopted which will secure to the patentee his actual invention, rather than to adopt a construction fatal to the grant, Keystone Manufacturing Co. v. Adams, 151 U. S. 139, 144, 145, 14 S. Ct. 295, 38 L. Ed. 103; McClain v. Ortmayer, 141 U. S. 419, 425, 12 S. Ct. 76, 35 L. Ed. 800."

It is apparent that the same thing occurs in the B tubes of Dubbs and furnace No. 2 of the defendant's process. But plaintiff calls it generation of vapor and defendant says it is vaporization. When defendant says substantial vaporization occurs to the extent of 50 per cent. to 58 per cent. in furnace No. 2, he means by "vaporization" what plaintiff means by "generation," for both agree that the vapor does not separate from the liquid in the B tubes or furnace No. 2. "Generation" seems to be the more accurate term to describe what both say takes place, for admittedly vapor is produced, comes into existence, in the B tubes and furnace No. 2. Both parties state this to be the fact. It is also admitted that this generated vapor is not there separated from the liquid, and does not go off as vapor, but continues as a mixture until it reaches the C tubes in the Dubbs process and the vapor separator, an equivalent, in the defendant's process.

In the Egloff patent, neither the phrase "without substantial vaporization" nor its equivalent, as respects the cracking tubes or coils, occurs. Even if the appellant has not infringed the Dubbs patent, it has infringed the Egloff patent whose process the appellant has substantially followed.

The disclosures in both the Dubbs and Egloff patents are novel and useful. They are accordingly valid and have been infringed by appellant. It follows that the decree must be affirmed.