## HAYES et al v. SURFACE COMBUSTION CORPORATION.

### No. 242.

Circuit Court of Appeals, Second Circuit.

April 4, 1938.

John F. Ryan, of New York City (Wallace R. Lane, of Chicago, Ill., and Nathaniel Frucht, of Providence, R. I., of counsel), for appellants.

Pennie, Davis, Marvin & Edmonds, of New York City (Dean S. Edmonds and Daniel V. Mahoney, both of New York City, of counsel), for appellee.

Before MANTON, L. HAND, and SWAN, Circuit Judges.

MANTON, Circuit Judge.

This suit is for infringement of claims 3 and 4 of patent No. 1,724,583, granted August 13, 1929, on an application filed May 11, 1928, and claims 3 and 6 of patent No. 1,808,721, granted June 2, 1931, on an application filed May 25, 1929, as a continuation in part of an earlier application.

The court below held the claims invalid for lack of invention. The inventions relate to the art of heat treating tool steels so as to obtain desired characteristics such as toughness, strength, and hardness. The inventions reside in the production and maintenance by means of a regulatable control of gaseous atmospheres which envelope the tool steel undergoing heat treatment, these atmospheres being of predetermined gase-

ous constituency in exact correspondence with the nature of the tool steel. The furnace made under the apparatus patent has been largely adopted in the tool steel industry and the patent has won a commercial success.

Heat treatment of metals had long been known. Atmospheres have been considered and used for enveloping tool steels undergoing heat treatment, but this inventor's idea employed in constructing a structure capable of adjustment to obtain any desired atmosphere within a heat treatment chamber is new. Prior knowledge relating to atmospheric conditions within the heat treatment chamber did not satisfy the art or solve the problem of heat treatment of tool steels. However, it seemed to be satisfied with this inventor's furnace and method which provided an effective solution.

One object of heat treating is to render the metal ductile or workable so that it may be readily shaped or formed. After the metal, in the instance of ferrous metals, has been rendered ductible and shaped, it is further heat treated so as to modify the structure as to harden the metal. Tools and working articles may then be heat treated to temper and toughen the metal and render it suitable for the particular use. Copper may be heat treated to render it more ductible by subjecting it to the proper temperature for an extended period of time, and this heat treatment has the effect of rendering the metal ductible, the chrystaline nature of the metal itself being rearranged and changed. Heat treatment of steel requires a higher temperature than that of copper, which has the effect of rendering the metal ductible and workable when cooled without quenching. This heat treatment is at relatively low temperature—it is called annealing—and such metal can be readily cut and shaped as desired. The temperature range for hardening tool steel varies from 1400°F. to as high as 2400°F., these temperatures producing internal changes and rearrangement of the grain structure of the steel itself.

The normal method in heat treating steels is to place it in a heated chamber which is maintained at the desired temperature. These chambers are heated by various means. In the early days, furnaces were heated by solid fuel such as coal and coke, and later furnaces were heated by gas or oil, using either natural gas or synthetic gas, the work itself being open to the atmosphere during the heat treatment, and being subject to the action of gases formed by the burning fuel. This affected the surface of the steel so as to produce undesirable surface condition and also altered its shape and dimensions. It was regarded as a necessary evil incident to the heat treatment required for tools. Attempts to correct these undesirable surface conditions were made. Usual methods followed, including coating the metal or packing the metal in materials such as coke or charcoal, in an attempt to control the surface conditions, and other attempts were made to change the character of the gases contacting the work so as to obtain an atmosphere which would not affect the surface. The use of a reducing atmosphere was at one time considered satisfactory since the work required from the steels was simple in character and substantially the sole requirement was that the steel be hard. Increased requirements for production in manufacturing operations resulted in the demand for steels that would stand up better for hard usage and alloyed steels came into use. These contained certain proportions and hardening ingredients such as chromium, tungsten, and molybdenum. These steels were capable of greater durability and longer life during manufacturing operations. It was recognized that atmospheric air and gases formed from the burning fuel were detrimental to the steel and attempts were made to use either a fixed gas such as nitrogen or to exclude atmospheric air and the gases from the burning fuel in the heat treatment chamber, in order to correct the difficulties encountered as a result of the high temperature heat treatment. These did not produce results of sufficient value to be the accepted practice. Other attempts were made, as using salt baths, having liquified salt at high temperature, but new difficulties were produced by these methods which outweighed their advantages. Experience taught that the difficulties were due to the lack of control of the atmosphere surrounding the work undergoing treatment with consequent injury to the work. Some of the difficulties were decarburization, scaling and pitting, necessitating additional steps as regrinding, sand blasting, rubbing and other processing before the finished tool could be delivered for use.

Prior to the Hayes furnace, a semi-muffle furnace heated by gas or other fuel with the burning products of combustion circulating in direct contact with the work being treated was generally used. It was the idea

of burning gas and air in a combustion pipe outside the furnace and introducing such combusted gases as a curtain across the throat entrance to keep out the air and provide the atmosphere that made possible the result attained by the inventor. He built his furnace accordingly. The inventor says that the combustion chamber was a pipe across the front of the furnace extending from the center of the furnace to the right hand side. In the center the pipe turned into a small chamber which extended into a slot reaching across the front of the furnace the full width of the floor opening. On the right hand end of the pipe was the burner, a loose burner, bringing both gas and air to that point where they could be mixed and combusted. He provided a little pilot hole for lighting the gas, the object being to keep the mixture burning or to promote the combustion of the mixture. He removed the burner and lighted it and stuck it into the pipe and as he did part of the products of the combusting mixture came through the hole and continued their combustion. The gases came from the pipe into this small chamber underneath the hearth which terminated at the top in a slot extending across the throat of the furnace. They came from the combustion chamber into that little auxiliary chamber.

■ Claims 3 and 4 of the apparatus patent provide:

"3. A device for controlling the atmospheric condition within a heating chamber having a door opening therein, comprising a combustion chamber, means for supplying regulated quantities of combustible and oxygen bearing gases thereto, and means for delivering combusted gases from said combustion chamber in an unbroken curtain across the door opening to exclude outside atmospheric air from said heating chamber.

"4. A device for controlling the atmospheric condition within a heating chamber having a door opening therein, comprising a combustion chamber, means for supplying regulated quantities of combustible and oxygen bearing gases thereto to produce combusted gases of predetermined constituency, and means for delivering the combusted gases from said combustion chamber in an unbroken curtain across and within said door opening to exclude outside atmospheric air from said heating chamber and to fill said heating chamber with combusted gases."

The patentee states the object of his invention to be "for the providing of a heat-treating furnace having means for heating a work-receiving chamber to a high degree, and the projecting of a thin film of highly heated gases across the mouth or entrance of the furnace to form a transparent, colorless, protecting curtain through which the condition of the work in the chamber may be clearly observed during the heat treating process, * * * to provide a furnace for heat treating metals having a narrow opening thru which the gases are forced to form the transparent curtain across the entrance to the chamber, the curtain being capable of excluding the external air from the chamber and means being also provided for varying the character or proportions of the curtain forming gases to affect the atmospheric condition in the chamber and the action of the heat in the chamber upon the work therein." It consists further in the provision of electrical means for heating the work-receiving chamber and independent means for forming a thin film or curtain of gases across the entrance of the work-receiving chamber. The furnace is built of a suitable refractory material within which is formed the work-receiving chamber which may be heated by gas or electricity. The inventor makes it clear that the essential feature of his invention is the provision of means for introducing a film of gases forming a transparent curtain across the mouth or entrance of the furnace chamber which will seal or exclude atmospheric air from the chamber.

The patent describes the operation of the structure. When this mixture of air and gas is introduced through these pipes to mix in the larger combustion tube or chamber 18, this mixture is ignited through the vent hold 22 in pipe 18 and, thus ignited, is forced by pressure of the gas and air into this slot or jet 16. The products then spread throughout the length of the slot and are forced upwardly to form the curtain across the mouth of the opening. The patent says: "It is found in practice by varying the proportions of the air and gas used to form this curtain by the valves 21 and 25, respectively, that the proper or desired atmospheric conditions within the furnace may also be regulated and maintained so as to obtain different desired effects upon the work being treated."

Claim 3 is directed to the provision of an atmosphere excluding curtain and claim 4 to the provision of a protecting atmos-

phere in the heating chamber and atmosphere excluding curtain.

The Marx patents, No. 1,357,790 and No. 1,399,638, are cited as anticipation of the patent in suit. In the Marx small furnace construction, the gas and air mixture combusts entirely around the muffle, the entire space around the muffle being filled with flame. This furnace could not be operated so that products of combustion come up through the slot and form a curtain. Nor could it operate to obtain both the desired enveloping atmosphere and the desired heat for treatment, as, each time an adjustment is made to adjust the temperature of the muffle, a change is made in the strength of the flame. It is impossible to control the atmosphere and the temperature at the same time, since the heating gases in this furnace provide the atmosphere. This furnace was not used to any extent.

Neither of the Marx patents disclosed the distinctive feature of the patent in suit. The distinction between the Marx patented furnace and the patented furnace here in suit is that the Marx curtain is a curtain of burning fuel while the patent in suit has a curtain of burned gases. Marx could not control the exact chemical composition of his furnace atmosphere, while this inventor does. In Marx the combustion must take place in the curtain and products of combustion so taking place affect the composition of the gases which finally fill the muffle.

The Lucas patent, No. 215,951, provided for a muffle furnace which has no regulated heat independent of the atmosphere. There is no separate atmosphere combustion chamber. It has no visual curtain and cannot provide predetermined constituency which is regulable for a variety of work. Lucas patent, No. 164,833, lacks the essential features of the patent in suit.

The Hermansen patent, No. 83,213 (Austrian), discloses combusted gases which are used as an enveloping atmosphere. It has neither the structure nor the control of the patent in suit.

■ We find no limitation in the claims by reason of the proceedings in the patent office. The file wrapper and contents found in the records show that claim 3 of the apparatus patent in its present form was introduced by amendment following the rejection of an earlier amendment on reference to Marx patent, No. 1,357,790. The remarks accompanying the second amendment said that the Marx furnace differed substantially from Hayes' in that it did not have (a) a separate combustion chamber; (b) the slot with the projecting gases to form a true atmosphere excluding curtain; and (c) a definite control over the metal enveloping atmosphere. The difference in control over this inventor's curtain from Marx due to the use of a slot contrasted with the perforated pipe of Marx was noted and the attention of the Examiner was called to a further distinction between the structures and the methods in that, in view of Marx's conception of the burning curtain, his device would not function with the door shut; so Marx testified. Whereas the Hayes' heating chamber would still contain the same predetermined regulated atmosphere necessary for proper heat treatment. Contrary to the court's opinion below, the testimony shows that the art used the term "combusted gases" as meaning "gases completely burned" as far as it is possible under the conditions to which the combustion was taking place and that the use of a separate combustion chamber permits complete combustion in a predetermined constituency of the resulting products.

Thus, this curtain, for certain steels is regulated to contain a combustionable element of definite amount and in such cases this combustionable element does not make the mixture combustionable, but does burn on the outside of the curtain due to the presence of oxygen and high temperature; that this burning is an incidental surface burning noticeable only from the side, and the curtain itself is transparent and colorless. The court below limited the invention to a nonignitable combusted gas and to a curtain which does not contain any combustible element. This was a misconception of the Patent Office procedure. The prosecution of a claim to cover the nonignitable gas, which is broad enough to cover the nonburnable gas such as nitrogen, does not bar the invention.

Claim 3 of the method patent includes combusted gases; such gases are completely combusted in the separate combustion chamber. They may contain an element which, under different air and heat conditions than exist in the combustion chamber, may burn.

■ The law permits of patentable inventions where there is more than conjecture of what might have been discovered and yet was not. Where a change has taken place, as here, in advancing this inventor's idea, and accomplishing such marked suc-

cess, there is novelty. A patentable invention may be the successor of all that went before and only a step beyond the prior art in the march of improvement. Diamond Rubber Co. v. Consolidated Rubber Tire Co., 220 U.S. 428, 31 S.Ct. 444, 55 L.Ed. 527; Root Refining Co. v. Universal Oil Products Co., 3 Cir., 78 F.2d 991.

Practical tool manufacturers paid tribute to the efficacy of the furnace as this record discloses. They did so with reason. It was after tests and experimentations that they purchased and repurchased the furnaces.

Infringement is established. Witnesses testified that the appellee's structure as manufactured and sold was substantially as that made by the appellant. There is a combustion chamber underneath the muffle for creating atmosphere, a slot leading from that chamber to a position adjacent to the front of the muffle which is heated by a separate unit, a lead which enables the atmosphere created by the combusted gas to go into the muffle, means for creating a curtain above the slot for protecting the opening of the furnace when the door is open, a door which can be raised and lowered to see the interior of the furnace and remove or put in work, with a peephole in it so that you can look through the door and there is no lead other than the slot at the front through which atmosphere may be introduced into the furnace and no other lead by which access may be had to the interior of the muffle. It is possible to regulate the control of the atmosphere on the interior of the furnace by introducing material that comes up through the slot in both appellant's and appellee's structure. Except for the substitution of gas as a source of heat instead of electricity, they are identical in means and operation. They have the separate combustion chamber, the slot forming an unbroken curtain across the door itself, the controlled enveloping atmosphere of combusted gases of predetermined constituency and variable for a variety of work.

Claims 3 and 4 of the apparatus patent are infringed.

The method patent No. 1,808,721 is a continuation of the earlier apparatus patent. The specifications of the method are largely a repetition of the methods set forth in the specifications of the apparatus patent, and in addition the inventor says:

"Thus, steels normally require an inert or nonreactive atmosphere, in order to eliminate oxidation and the resultant scaling and pitting; high speed steels, however, may be hardened by heat treatment in an atmosphere containing a slight, definite, excess of carbon monoxide.

"Applicant, therefore, provides a furnace for heat treatment which permits an accurate control of the metal enveloping atmosphere, and also facilitates heat treatment control by using a colorless, transparent, gaseous curtain through which the metal may be inserted and removed, and through which the heat treating may be observed."

Claim 3 is directed to the provision of a transparent curtain across the furnace:

"A method of visual inspection and control for heat treatment of metals in a furnace having an opening therein, comprising

"mixing combustible gases and oxygen bearing gases in predetermined proportions,

"combusting said gases,

"and projecting said combusted gases as a transparent colorless curtain across said opening to exclude atmospheric air."

Claim 6:

"In a method of heat treating, the steps of combusting predetermined proportions of combustible and oxygen bearing substances in a combustion chamber to obtain products of combustion of predetermined constituency, utilizing the products of combustion in a heat treating chamber as an enveloping atmosphere for material to be heat treated

"and subjecting the material to be heat treated and the enveloping atmosphere to regulated heat,"

is directed more broadly to the use of products of combustion of predetermined constituency as an enveloping atmosphere for material to be treated.

Claim 6 omits the curtain element and we think is broad enough to embrace the prior art, and was anticipated.

Claim 3 is valid and infringed.

The result is not an aggregation of old well-known elements or old well-known steps, but a new combination which accomplishes a better and less costly heat treatment for tool steels.

There was patentable invention in the apparatus claims and in claim 3 of the

method. Both patents are held valid and infringed.

Judgment reversed.

L. HAND, Circuit Judge (dissenting).

I shall assume that Marx's first furnace could not be used successfully; that if the combustion was perfect enough to heat the muffle, the mixture in the screen was too lean, and vice versa. But Marx knew what he wanted, and if the furnace was inefficient, I should have thought it no long step to use two mixes, one to heat the muffle, and the other to furnish the "atmosphere." At any rate that is what he did almost at once, and that is the furnace he patented. It so chanced that when he did it, instead of leaving the screen combustion chamber where it had been in his first furnace, he used a pipe with a row of holes running along the front of the muffle and just at its floor level. That placed the combustion in the lower part of the screen, and not in a separate chamber from which the burned gases should be discharged. At most Hayes can be said to have done nothing more therefore than replace in Marx's second furnace the screen chamber of the first. I dare say that that was an advance—though Marx's furnaces are still being made—and of course I do not dispute that inventions are substantially always new combinations of old elements; but I cannot bring myself to believe that if in use the second Marx screen proved objectionable, it took more than ordinary talent to try out the first in its place. It is to be remembered that while Hayes says that "the essential feature" of his invention is "to form a transparent curtain" to "seal" the muffle and give it a "suitable atmosphere", he also says that his disclosure was only "one means" of doing this. The base of Marx's curtain was indeed aflame and not transparent, but this was only a trifling disadvantage in practical use, and again if one was not satisfied, one had only to go back to the first form. True, there was an interval of nearly ten years between the appearance of Marx and of Hayes, and undoubtedly that counts in the plaintiff's favor, but its force is largely broken by the fact that Marx had made no effort to exploit his furnaces; the first was practically unknown, and the second little known. It is not as though the art had known and used them both freely, and had found them unsatisfactory, without seeing how to combine them until Hayes came along. In such cases there is always great danger in taking success as evidence of invention. That can be done safely when the approaches to the invention were widely known and used at the time; it is then a reasonable major premise that it took uncommon eyes to see what many passed by. But obviously if the earlier forms were hidden or not accessible, success ought not to be imputed to the final step alone. I do not suggest that without Marx as a precursor Hayes's furnace would not have been patentable; but I do not see how we can separate his contribution from Marx's, and the evidence from success seems to me a broken reed.