## DOW CHEMICAL CO. v. WILLIAMS BROS. WELL TREATING CORPORATION.

### No. 1285.

Circuit Court of Appeals, Tenth Circuit.

Jan. 10, 1936.

Rehearing Denied Feb. 25, 1936.

Arthur C. Brown, of Kansas City, Mo., and Russell Wiles, of Chicago, Ill., for appellant.

Wilbur J. Holleman, of Tulsa, Okl. (N. A. Gibson and J. H. Maxey, both of Tulsa, Okl., on the brief), for appellee.

Before PHILLIPS, McDERMOTT, and BRATTON, Circuit Judges.

McDERMOTT, Circuit Judge.

Appellant here, plaintiff below, is the owner of United States Patent 1,877,504, issued September 13, 1932, upon application filed June 30, 1932. The object of the invention is to increase the recovery of oil from wells in a limestone formation, and is attained by injecting an inhibited hydrochloric acid (HCl) into the formation, which eats away the retaining rock structure and frees the oil. The genius of the invention is, in the use of a reagent with the acid which

inhibits its action on the metal casing and tubing of the well without affecting its powers on the rock formations. Having conceived the idea, extensive experimentation was carried on to demonstrate its utility before applying for the patent. The patented process met with instant and overwhelming success, the list of the wells treated under contract with plaintiff covering page after page of closely set pages of the record. The process was being used at the time of the trial in 16 oil producing states. In Kansas alone, 535 wells were treated and the treatment increased their production 225.1 per cent. Among its customers are many of the great oil companies.

The claims of the patent specify the use of HCl with an inhibiting reagent, some of them specifying within limits the proportions of acid, reagent, and water in the solution, and three claiming the step of forcing the solution into the rock formation under pressure. Claims here relied upon are 1, 5, 7, 8, and 10. Claim 7 will serve to illustrate:

"The method for increasing the output of an oil well which comprises introducing into the base of such well a 5 to 20 per cent hydrochloric acid solution containing a relatively small amount of a corrosion inhibitor, permitting the acid to act upon the rock formation surrounding the well cavity while applying pressure upon the solution and withdrawing the spent acid."

Defendant infringes if the patent is valid. Plaintiff brought this action to enjoin further infringement and for an accounting. The conventional defenses were interposed. After a trial, the court found there was no invention in light of the then state of the art, and that the claims had been anticipated by prior patents and public use. The bill was dismissed.

1. *Invention.* The use of various reagents with acids to inhibit their action on metals without impairing their other powers has been known and widely employed since 1883, and many patents have issued, claiming processes using inhibited acids.[1] In 1928 the Gypsy Oil Company, as will be seen more fully later, experimented with an inhibited acid to clean gypsum scale from pumping apparatus.

In 1896 Frasch obtained a patent (No. 556,669) upon the method of increasing the flow of oil by the use of acids to eat away the retaining limestone structure. Frasch's process contained the steps of forcing raw HCl under pressure into the rock formation to release the oil. Not using an inhibited acid, Frasch specified means to protect the casing, which was to place in the well, inside the casing, an enameled pipe, lined and covered with two soft rubber tubes, and sealing the crevices between the pipe and the irregular hole in the rock below the casing with a packer to prevent the acid rising in the hole. This made it necessary to pull the tubing. After treatment, and before pumping was resumed, traces of acid left in the well were neutralized by an alkaline. Frasch's method was cumbersome and expensive, and probably impracticable because of the inherent difficulty in adequately sealing off the acid at the bottom of the hole. In any event Frasch's patent met with no commercial success.

What plaintiff did was to combine the Frasch idea of using acid to dissolve retaining limestone in an oil well, with the inhibited acids long used in the steel industry. Does that simple conception involve invention?

At first blush, the conclusion seems irresistible that no inventive genius was employed in substituting an inhibited acid, long known in the steel industry, in the Frasch process. On the other hand, the stubborn fact remains that plaintiff was the first to solve a problem which has baffled all the scientific skill at the command of the oil industry for generations. Looking backward, it seems inconceivable that the simple idea disclosed by this patent was not hit upon many, many years ago; yet the fact remains it was not. It has been authoritatively decided that reward to inventive genius must not be

---

[1] The following patents claim processes for cleaning, treating, and pickling iron or steel products for various purposes, such as in automobile radiators, metal drums for transporting acid, and in iron and steel mills:

No. ————, Aitken, November 6, 1883

No. 914,916, Beneker, 1909
No. 1,678,775, Gravell, 1925
No. 1,746,678, Rhodes, 1925
No. 1,750,651, Vignos, 1927
No. 1,766,902, Harrison, 1928
No. 1,773,953, Corson, 1929
No. 1,785,513, Calcott, 1929

denied because the invention is one which, viewed in retrospect, seems so simple that it is difficult to say that genius attended its conception. A broader view must be taken, and the philosophical must give way to the practical. For example, the idea of putting an electric fan in an incubator, Smith v. Snow, 294 U.S. 1, 55 S.Ct. 279, 79 L.Ed. 721, and of a coiled barb instead of a straight one on a wire fence, Barbed Wire Patents Case, 143 U.S. 275, 283, 12 S.Ct. 443, 446, 36 L.Ed. 154, have both been held to involve inventive genius. In the latter case, it is said:

"But it is plain from the evidence, and from the very fact that it was not sooner adopted and used, that it did not, for years, occur in this light to even the most skillful persons. It may have been under their very eyes; they may almost be said to have stumbled over it; but they certainly failed to see it, to estimate its value, and to bring it into notice. * * * Now that it has succeeded, it may seem very plain to any one that he could have done it as well. This is often the case with inventions of the greatest merit. It may be laid down as a general rule, though perhaps not an invariable one, that if a new combination and arrangement of known elements produce a new and beneficial result, never attained before, it is evidence of invention."

The District Court for the District of Maryland dealt with a patent which seemed, looking backward, to be so simple as to be obvious to all. It affirmed the closely reasoned opinion of Judge Soper who used this language, apposite here:

"Schaub's idea was a simple and complete solution of the problem that the art had been considering for many years, and it was close at hand. But was it obvious to persons skilled in the art? If so, as the plaintiff pertinently inquires, why did not Worden, the foremost expert in nitrocellulose solutions, or Duncan, or Denayrouze, or Poulton, or the Dupont Company, discover it and disclose it to the world? To bring the problem home to the parties in this suit, why did not the Sterno Corporation, which has been the most active dealer in solid alcohol in this country since 1914, introduce this useful improvement in the manufacture of its product. None of these experts and practical men made the discovery, although vitally interested in the problem,

and it follows that their failure was due to lack of the inventive ability on this particular point which the patentee possessed. Diamond Rubber Co. v. Consolidated Tire Company, 220 U.S. [428], 434, 31 S.Ct. 444, 55 L.Ed. 527; Eibel Process Co. v. Paper Co., 261 U.S. 45, 43 S.Ct. 322, 67 L.Ed. 523." Theroz Co. v. United States Industrial Chemical Co. (D.C.) 14 F.(2d) 629, 634, 635, affirmed (C. C.A.) 25 F.(2d) 387, certiorari denied 278 U.S. 608, 49 S.Ct. 12, 73 L.Ed. 534.

Mere substitution of material may or may not involve invention. If a new result, or an old result in a better way, is accomplished through inventive genius, it is no defense to say that it but involved a substitution of materials, particularly when experimentation is required to demonstrate the practical value of the article used. Walker, in his work on Patents, says in § 66:

"If the substitution of materials involved a new mode of construction, or if it developed new properties and uses of the article made, it may amount to invention. And substitution of materials may constitute invention, where it produces a new mode of operation, or results in a new function, or in the first practical success in the art in which the substitution is made, or in increased efficiency or in a decided saving in cost of operation. So also, where the excellence of the material substituted could not be known beforehand, and where practice shows its superiority to consist not only in greater cheapness and greater durability, but also in more efficient action, the substitution of a superior for an inferior material amounts to invention."

To get a broad view, we look to the situation as it was when the patent was applied for. For many years it had been known that but a small percentage of the oil in the reservoirs of the earth was recoverable by pumps. Many expedients to increase that recovery were in use. Nitroglycerin was used to break down the rock structure; methods employing the principles of the vacuum were tried; natural gas was injected into the sands under pressure through master holes or abandoned wells. A modicum of success attended all these efforts. There was a real need for any process which would either increase the ultimate recovery from the sands, or do the same work at lesser cost.

That this need was met by this process is demonstrated by its instantaneous and overwhelming adoption by the industry. The acute interest of the industry is indicated by the fact that during the 75 days elapsing between the application and the patent, letters of inquiry were received from the Stanolind, the National, the Indian Territory, the Gulf, the Union, the Empire, the Continental—great oil companies which have staffs of scientists at their service.

■ The patentee expended substantial sums in demonstrating the utility of the invention before applying for the patent. Such experimentation was essential, for while the action of certain reagents with certain acids was known at atmospheric pressures, their reaction was not known in the presence of the gases and at the pressure which exists in an oil sand thousands of feet below ground. Would the inhibited acid actually dissolve the limestone structure at such pressure and in the presence of the gases at the bottom of a well? Would it cut channels in the lime so the oil could be saved? Chemists do not understand the chemical changes which follow when acids are partially inhibited, for as said by an outstanding authority, in a report introduced by defendant, "The mechanism of the inhibited action is very little understood." When the Research Laboratory of the Mellon Institute, after elaborate experimentation, discovered that an inhibited acid would remove the limestone scale from pumps and tubing, the scientists then suggested its use to prevent further deposits. Yet its action for that purpose was exactly contrary to the prediction of the scientists, for it increased the deposit. If the outstanding scientists of the Mellon Research Laboratories forecast the exact opposite of the effect of this inhibited acid in the bottom of an oil well; it must be true that experimentation was necessary to prove that the idea of the inventor would work.

Frasch, an experienced chemist seeking to solve the same problem, failed to conceive the last step which did away with the necessity of his cumbersome, expensive, and impracticable method of getting the acid to the limestone without ruining the casing or tubing; the capable and practical scientists in the research departments of the great oil companies, confronted for many years with the problem and the Frasch patent and their knowledge of inhibited acids in other industries, never thought of this simple solution. The Mellon Institute, devoted to the practical application of science to the problems of industry, considered the use of inhibited acids for cleaning gyp scale from tools and the face of sandstone which was impervious to acids; they stood on the very brink of the idea that the same acids might dissolve limestone retaining the oil, but confronted with a quite different problem, the conception escaped them. That such experienced men came close but missed is some evidence that inventive genius is involved. Stearns-Roger Mfg. Co. v. Ruth (C.C.A.10) 62 F.(2d) 442, 447.

■ In this state of the art, we are of opinion that the patent is not invalid for lack of invention.

2. *Combination or Aggregation.* It is contended that the patent consists of an aggregation of old ideas, and not a combination involving invention. This court has so recently explored this question it is unnecessary to till that ground again. Independent Oil Well Cementing Co. v. Halliburton (C.C.A.10) 54 F.(2d) 900, certiorari denied 286 U.S. 544, 52 S.Ct. 496, 76 L.Ed. 1281; Skinner Bros. Belting Co. v. Oil Well Improvements Co. (C.C.A.10) 54 F.(2d) 896. See, also, Judge Booth's excellent analysis in Gray v. Texas Co. (C.C.A.8) 75 F.(2d) 606. We there held that a new combination of old elements was patentable, if the conception involved invention, and if a new result was produced, or an old result attained in a more facile, economical, and efficient way. In so holding, we but followed Leeds & Catlin Co. v. Victor Talking Machine Co., 213 U.S. 301, loc. cit. 318, 29 S.Ct. 495, 500, 53 L.Ed. 805, where the Supreme Court held that "A combination is a union of elements, which may be partly old and partly new, or wholly old or wholly new." We also held that a patentable combination of elements exists if by their reciprocal influence or joint and co-operative action on a common objective, a new result, or an old result in a more efficient way, is effected; such joint action need not be simultaneous nor constant. This patent meets those tests. The result of producing more oil in a more efficient way is accomplished by introducing an acid into the sand through the tubing and casing. The inhibitor protects

the tubing as the acid passes through it to accomplish its purpose in the lime. The inhibiting reagent alone could not dissolve the limestone; the acid without the inhibitor had proven to be a failure. Only through the co-action of the two was the result accomplished in a practical way.

3. *Anticipation.* Invention is determined against the background of prior art, and what we have heretofore said ón invention bears directly on the question of whether the novelty we find otherwise to exist is negatived by prior patents, publications, or public use. We deal with the questions separately, as do the parties and the trial court.

Was the invention patented or described in any printed publication before the invention? If we are right in our conclusion that the patent in suit takes an inventive step beyond Frasch, then Frasch does not anticipate.

The Mellon Institute made an investigation for the Gypsy Oil Company to determine the cause of a deposit of gypsum on pumping equipment, to find a method for its removal and to prevent further deposits. It reported the results to the company and recommended the use of an inhibited acid for that purpose, the inhibitor protecting the tubing as the acid was forced through to remove the scale. At the conclusion of that report, it was suggested that doubtless the gyp scale was deposited on the surface of the sand in the well cavity, and that the acid might likewise be used to remove the scale from sand, saying "Therefore, the trial would be well worth the expense for its possible value in increasing the production of the well entirely aside from the object of removing the scale from the pipe."

The proof is convincing that this was a private report to one entitled to the services of the Institute; it was never published and is not therefore a "printed publication." See United Chromium v. General Motors Corporation (D.C. Conn.) 11 F.Supp. 694, in which the authorities are gathered. Furthermore, the purely incidental suggestion that gyp scale might be removed from an acid-resistant sand as well as from steel tubing, is not an anticipation of the idea of forcing the acid through the limestone formation in which nature stored its oil.

Was the patented process in public use for more than two years prior to the application? If so, was such use abandoned?

(a) *The Gypsy Use.* The Gypsy Oil Company had been troubled with a deposit of gypsum scale on apparatus in the bottom of the pumping well which clogged the machinery. Pulling the tubing to remove the scale by hand was expensive. Accordingly the services of the Mellon Institute were solicited, and the result was the report above referred to. In November, 1928, an effort was made, as so advised, to remove the scale from the apparatus in one well. A witness testified the experiment was scientifically successful but economically unsuccessful because of the low price of oil and the small production; that "some of the boys" at the well thought production was increased, others not except as the well was operated more regularly. The written report made at the time from the field to the home office was terse: production was not increased and the cost was prohibitive. The Pittsburgh office thought the cost was not too high to discourage further tests. The acid treatment was tried eight times more in 1929, 1930, and 1931, but the last five times acid without the inhibitor was used; between July, 1931, and February, 1933, no wells were treated with acid, with or without inhibitors; from February, 1933, until September, 1934, the Gypsy treated 85 wells with plaintiff's process.

This is clearly no more than an unsuccessful and abandoned experiment. The record does not disclose the far-flung operations of the Gypsy Oil Company; but a written report does show that its wells were shut down 75 times in six months because of this gyp deposit. Yet in the five years between the Mellon Institute report and the patent in suit, the Gypsy tried out its recommendations but three times. Then it dropped the use of an inhibitor with the acid and tried the experiment five times with raw acid. Two years then elapsed without an acid treatment in a single one of the wells of this great company. But when the plaintiff disclosed his process in this patent, the Gypsy used it in 85 wells in a little more than a year.

Nor do we think this use anticipated plaintiff's invention. Plaintiff's invention is only useful in oil retained in rock formations which HCl will dissolve; the Gypsy use was confined to wells in a

sand which is impervious to HCl. The Gypsy was grappling with the problem of removing a scale which clogged machinery; plaintiff grappled with the problem of freeing the oil which clung so persistently to its mother rock that pumps and explosives could not dislodge it. The Gypsy use taught no more than an economically unsuccessful method of removing scale from machinery and an impervious sand in order that pumps could function; plaintiff conceived the idea of dissolving the formation in which nature stored its oil.

While the patentee is charged with knowledge of the prior art in determining the question of inventive genius, including disclosures of part of his conception in one patent and part in another, it is not true that when novelty exists notwithstanding the background, such novelty is negatived and an otherwise valid patent anticipated by various steps selected from several other patents, nor from a use which was not designed for, adapted to, or actually used to produce the result accomplished by the patent assailed. While the function of a machine is not patentable as a process, a process patent can only be anticipated by a similar process. Carnegie Steel Co. v. Cambria Iron Co., 185 U.S. 403, 424, 22 S.Ct. 698, 46 L.Ed. 968.

In Bates v. Coe, 98 U.S. 31, 42, 48, 25 L.Ed. 68, the court dealing with the defense of anticipation, held:

"In determining about similarities and differences, courts of justice are not governed merely by the names of things; but they look at the machines and their devices in the light of what they do, or what office or function they perform, and how they perform it, and find that a thing is substantially the same as another, if it performs substantially the same function or office in substantially the same way to obtain substantially the same result; and that devices are substantially different when they perform different duties in a substantially different way, or produce substantially a different result. * * *

"Where the thing patented is an entirety, consisting of a single device or combination of old elements, incapable of division or separate use, the respondent cannot escape the charge of infringement by alleging or proving that a part of the entire thing is found in one prior patent or printed publication or machine, and another part in another prior exhibit, and still another part in a third one, and from the three or any greater number of such exhibits draw the conclusion that the patentee is not the original and first inventor of the patented improvement."

In Topliff v. Topliff, 145 U.S. 156, 161, 12 S.Ct. 825, 828, 36 L.Ed. 658, the court said: "It is not sufficient to constitute an anticipation that the device relied upon might, by modification, be made to accomplish the function performed by the patent in question, if it were not designed by its maker, nor adapted, nor actually used, for the performance of such functions."

And in Carnegie Steel Co. v. Cambria Iron Co., 185 U.S. 403, 421, 22 S.Ct. 698, 705, 46 L.Ed. 968, the court said:

"This defence presents the common instance of a patent which attracted no attention, and was commercially a failure, being set up as an anticipation of a subsequent patent which has proved a success, because there appears to be in the mechanism described a possibility of its having been, with some alterations, adaptable to the process thereafter discovered. As hereinafter observed, a process patent can only be anticipated by a similar process. It is not sufficient to show a piece of mechanism by which the process *might* have been performed."

In Coffin v. Ogden, 18 Wall.(85 U.S.) 120, 21 L.Ed. 821, prior use was held no defense where it was not complete but embryonic and experimental, and which was not capable of producing the desired result. In Parks v. Booth, 102 U.S. 96, 103, 26 L.Ed. 54, the court said there was no anticipation where the prior art did not describe "the same combination in its entirety nor the same mode of operation." The Circuit Court of Appeals, Sixth Circuit has held, National Battery Co. v. Richardson Co., 63 F.(2d) 289, 291, "we do not think that those patents which do not disclose the purpose and means for accomplishing the end of the patent in suit, and which were obviously intended for the accomplishment of a substantially different and limited purpose, can be considered as anticipations." The Circuit Court of Appeals, Fourth Circuit, in Imperial Bottle Cap & Mach. Co. v. Crown Cork & Seal Co., 139 F. 312, 320, held "The finding in the old devices, one portion here, one in

another, and so on, should not defeat a patent for the combination, which is only truly anticipated by a prior device having identically the same elements, or their mechanical equivalents, co-operating to produce the same results." The Circuit Court of Appeals, Ninth Circuit, in Butler v. Burch Plow Co., 23 F.(2d) 15, 26, held there was no anticipation where "there was nothing known to the art which would perform the functions of the Burch spreader." The Circuit Court of Appeals, First Circuit, in Independent Coal Tar Co. v. Cressy Contracting Co., 260 F. 463, 469, held "None of the patents cited in the Patent Office or by the appellant disclose the combination of Pillsbury or any single machine that produced the same result." The Circuit Court of Appeals, Eighth Circuit, in Ottumwa Box Car Loader Co. v. Christy Box Car Loader Co., 215 F. 362, 369, held "It is indispensable that all of them, or their mechanical equivalents, be found in the same description or machine, where they do substantially the same work by the same means." The Circuit Court of Appeals, Second Circuit, in Rockwood v. General Fire Extinguisher Co., 8 F.(2d) 682, 686, held a prior device did not anticipate which was not "designed by its maker, nor adapted nor actually used, for the performance of such functions." Walker states the rule, § 91, as follows:

"Therefore in order to negative novelty or as it is usually expressed, to 'anticipate' an invention, it is necessary that all of the elements of the invention or their equivalents be found in one single description or structure where they do substantially the same work in substantially the same way." [2]

(b) *The Muskegon Idea.* In 1930 one Hower used raw HCl to increase production in his wells; he found it damaged the tools and equipment, and ceased its use. He testifies that he inquired of druggists and chemical salesmen as to whether there was some reagent which could be added to the acid to prevent its corrosion of metals, and was told there was. He did nothing more until July, 1932, after the patent herein was applied for. These facts do not invalidate this patent; the fact that Hower, an inexperienced roustabout, now testifies that he thought of the idea, bears upon the question of whether the invention was the product of genius, but cannot prevail over the stubborn fact that Frasch, the research departments of great oil companies, and the Mellon Institute, failed to conceive what plaintiff has patented.

4. *The File Wrapper.* Because of the immediate adoption of the process by the industry even before issue, a petition to make the case special was granted, and the hearing on the application advanced, provided the applicant agreed to make prompt effort to place the case in condition for allowance, and to have an interview with the examiner if necessary. The application was twice rejected upon references now relied on; plaintiff's counsel met the first by a written exposition, and the second by an oral interview, after which the application passed to issue. It is contended that the attorney for plaintiff misstated a fact as to certain cited references in that interview. The trial court found the patent issued inadvertently due to such misrepresentations. The proof is simply an unsworn one-sentence résumé of the interview by the examiner. No defense of fraud was pleaded. Manifestly the patent is not subject to collateral attack under such state of the record, and it is not so contended; but it is claimed that the presumption of validity arising from its issuance is neutralized. Corona Cord Tire Co. v. Dovan Chemical Corp., 276 U.S. 358, 48 S.Ct.

---

[2] Other cases to the same general effect are: National Hollow B.-B. Co. v. Interchangeable B.-B. Co. (C.C.A.) 106 F. 693, 702; Minneapolis, St. P. & S. S. M. Ry. v. Barnett & Record Co. (C.C.A. 8) 257 F. 302, 307; Van Heusen Products, Inc. v. Earl & Wilson (D.C.N.Y.) 300 F. 922, 930; Lewis v. Merritt, Chapman & Scott Corp. (D.C.N.Y.) 3 F.(2d) 66, 71; Detroit Motor Appliance Co. v. Burke (D.C.Minn.) 4 F.(2d) 118, 120; West v. Premier Register Table Co. (C.C.A. 1) 27 F.(2d) 653; Doughnut Machine Corp. v. Demco, Inc. (D.C.Md.) 51 F.(2d) 364, 370; Allied Metal Stamping Co., Inc. v. Standard Electric Equipment Corp. (D. C.N.Y.) 57 F.(2d) 296, 302; Kny-Scheerer Corp. v. American Sterilizer Co. (D. C.) 5 F.Supp. 273, 276; Universal Oil Products Co. v. Winkler-Koch Engineering Co. (D.C.N.Y.) 6 F.Supp. 763, 770; Six-Way Corp. v. McCurdy & Co. (D.C.N.Y.) 11 F.Supp. 734, 737; Royal Lace Paper Works v. U. S. Lace Paper Works, Inc. (D.C.N.Y.) 11 F.Supp. 15, 17; Catalin Corp. v. Catalazuli Mfg. Co. (C.C.A. 2) 79 F.(2d) 593. See, also, Walker on Patents, § 107.

502

380, 72 L.Ed. 610; R. Hoe & Co. v. Goss Printing Press Co. (C.C.A.2) 30 F.(2d) 271; Stoody Co. v. Mills Alloys (C.C.A.9) 67 F.(2d) 807. Plaintiff, on the other hand, contends the presumption is double-riveted because of the careful consideration of all references, and because the application was of such importance to the industry that a petition to make special was granted. Hildreth v. Mastoras, 257 U.S. 27, 42 S.Ct. 20, 66 L.Ed. 112; Ensign Carburetor Co. v. Zenith-Detroit Corp. (C.C.A.2) 36 F.(2d) 684; Imperial Bottle Cap & Mach. Co. v. Crown Cork & Seal Co. (C.C.A.4) 139 F. 312. We have arrived at our conclusion without the necessity of leaning heavily upon this legal presumption; if it were neutralized, there is still the much stronger and persuasive evidentiary presumption in the fact of its instantaneous and overwhelming adoption by the industry. We may add that, considering the file wrapper in its entirety, we do not consider the legal presumption impaired by its history in the Patent Office.

The decree is reversed with directions to grant the injunction prayed for and to take an account of the damage.

Reversed.

### On Petition for Rehearing.

In the opinion it is stated, arguendo, that the use of an inhibited acid to prevent scale formation had been recommended to the Gypsy Oil Company by scientists of the Mellon Institute. The petition for rehearing advises us that the scientist so recommending was employed directly by the Gypsy, and an argument is made that the experiment was unsuccessful for physical as distinguished from chemical reasons. The voluminous record is confusing, but we do find, buried in a long report, the statement that the scientist in question was a "chemist in the Gypsy Oil Company's Geological Department." The descriptive phrase "of the Mellon Research Laboratories" in the ninth paragraph of the topic "Invention" is eliminated. The point remains however, that an experienced scientist recommended an acid treatment which for some reason failed. This circumstance seems to be a fair argument supporting the major proposition that experimentation was necessary to demonstrate that plaintiff's conception was practicable, a proposition to which scientists doubtless would not dissent.

The case is a close one; but after considering the petition for rehearing, we adhere to our conclusion that courts should be slow to deny invention to a process which the industry, by immediate and far-flung adoption, has acclaimed as new and useful. Experts freely testified that the conception lacked invention; but none satisfactorily explained why some one of the many experts working in the field did not in fact conceive of the idea which has revolutionized the treatment of oil wells to prolong production.

The petition for rehearing is denied.