## AMERICAN CHEMICAL PAINT CO. v. PARKER RUST PROOF CO.

### No. 8073.

District Court, E. D. Michigan, S. D.

Jan. 15, 1940.

Synnesvedt & Lechner, of Philadelphia, Pa., and Whittemore, Hulbert & Belknap, of Detroit, Mich., for plaintiff.

Harness, Dickey & Pierce and Robert W. Englehart, all of Detroit, Mich., for defendant.

Findings of Fact.

LEDERLE, District Judge.

1. Plaintiff filed this suit for a declaratory judgment of its rights with respect to both infringement and validity of defendant's United States Patents Nos. 1,911,726 and 1,869,121, and for recovery of damages incident to alleged unfair trade practices of the defendant. Defendant counterclaimed for infringement under Patent 1,911,726 only.

Both patents are process patents relating to the art of coating metals for the purpose of making surfaces rust-resisting, commonly called "rust-proofing".

2. No evidence was offered that plaintiff or its customers have been charged by defendant with infringement of defendant's patent 1,869,121. There is no evidence that an actual controversy existed between the parties as to this patent at the time of filing the bill of complaint herein, or since.

Hereafter Patent 1,911,726 will be designated as the patent in suit.

3. The use of phosphate coatings for rust-proofing has been known to the art for many years, numerous patents having been issued in this field.

United States Patent No. 1,007,069, issued to Thomas Watts Coslett October 31, 1911, described a zinc phosphate solution which will produce a phosphate coating on iron or steel, when freshly made up, in approximately one minute. In order to produce satisfactory coatings in this manner, it is necessary to have the solution in a condition described in the art as being in "balance".

As soon as a zinc phosphate bath is made up, it starts to hydrolyze, and the time necessary to produce a satisfactory coating increases. Theoretically, it is possible to produce satisfactory coatings in a short period of time with a fresh solution, but this is not practical commercially.

The application for the patent in suit was filed in July, 1931, and, although the art of phosphate coatings was highly developed, no one had prior thereto discovered a means of securing satisfactory coatings in less than ten minues in a bath that could be used commercially.

4. The addition of sodium nitrite to a dilute acid zinc phosphate solution similar to the Coslett solution will cause it to give coatings in a very short time (approximately one minute) and continue to do so provided the bath is replenished with zinc phosphate and sodium nitrite.

5. The usual method of treating iron or steel is by immersing the article in a bath or by continuously spraying the solution against the article, until the coating is formed. When the article is immersed in the solution, or the solution sprayed upon it, the acid of the solution attacks the surface of the metal, causing it to dissolve. The metal of the article which dissolves combines with the free phosphoric acid of the solution at the surface of the article and forms ferrous phosphate. This uses up free acid of the bath at the surface of the article, and causes the solution at the surface of the article to become supersaturated with insoluble phosphates, which then deposit upon the surface of the article, forming a phosphate coating thereon composed of zinc and ferrous phosphate. The hydrogen ions of the free acid attack the metal and cause the metal to dissolve. In a plain zinc phosphate bath that does not contain any of the oxidizing agents of the patent in suit these hydrogen ions accept electrons at the surface of the article and permit or cause the ferrous ions at the surface of the article to go into solution, where these ferrous ions combine with the phosphate ions of the acid and form ferrous phosphate.

6. At the present time substantially all of the metal parts of automobiles manufactured in America are given such so-called rust-proof coatings. The importance of this art may be noted from the growth of its use in the automobile field.

The defendant company has been engaged in the business of providing rust-preventative coatings on metal surfaces since about 1915. It has treated such metal articles in its own plant for its customers and has also installed equipment and processes for carrying out such treatment in the plants of its customers. Where it has installed such equipment it continues to service it and furnishes its customers with the necessary chemical materials. For many years defendant dominated this field and at present its business is of a very substantial volume, reaching practically the entire automobile industry, as well as other lines of manufacture in which rust-resistant surfaces are desired for articles of iron or steel. It maintains a large laboratory and

a staff of technically trained chemists who have been continuously for many years studying new developments in this art. Due largely to the efforts of defendant, the use of rust-proofing has developed from a small beginning, in which only nuts, bolts and other small parts of the automobile were rust-proofed, until at the present time substantially all of the parts of the automobile subject to damage by rusting are so coated. Improvements in the art have made it possible to get satisfactory rust-proof coatings at greatly reduced cost to the consumer. These rust-proof coatings are valuable and desirable as a base to which paint or enamel may be applied, as well as where no paint or enamel is used. They provide a desirable bond or base for paint in that such surfaces are roughened and relatively porous as compared with a plain metal surface, and paint more closely and permanently adheres to such treated surfaces.

7. The plaintiff has been engaged in business since about 1914. Until recent years its principal business has consisted of manufacturing and selling materials for cleaning metal surfaces prior to painting. These preparations contained some phosphoric acid for removing rust and also suitable solvents, such as alcohol, for dissolving oil or grease upon metal surfaces. These materials were not intended to, and did not, produce permanent, definite and substantial phosphate coatings. It was not until about the year 1932 that plaintiff started engaging in the business of furnishing phosphate coatings and materials.

8. Patent 1,911,726 was issued May 30, 1933, and is owned by defendant and counter-claimant, and this company is entitled to maintain suit for infringement thereof. The patent is the joint invention of Robert R. Tanner and Herman Johan Lodeesen, the patentees described therein. The invention was made by the patentees jointly. They were co-workers in the laboratory of the Metal Finishing Research Corporation, the original assignee of the patent, and were searching together for a way to obtain more rapid phosphate coating processes and solutions. They began experiments in their collaboration which eventually led them to the discovery of the process outlined in their patent. Their work in the matter was carried on jointly in the same laboratory in constant collaboration with each other, and they are in fact joint inventors.

9. The claims in suit read as follows:

"2. The method of expediting the coating action upon a surface of ferrous metal of a dilute solution containing acid phosphate as the major portion of its coating chemicals, which consists in oxidizing hydrogen, as it is released in the coating operation at the surface, by use in the solution of an oxidizing agent having an oxidation potential not greater than the potential of the common bromates in a dilute phosphate solution.

"3. The method of expediting the rust-proofing of ferrous surfaces by a solution containing acid phosphate as the major portion of its coating chemicals, which consists in oxidizing hydrogen, as it is released in the coating operation at said surface, by use in the solution of a nitrate of a metal as high in the electromotive series as iron.

"4. The method of expediting the rust-proofing of ferrous surfaces by a solution containing acid phosphate as the major portion of its coating chemicals, which consists in oxidizing hydrogen, as it is released in the coating operation at said surface, by use in the solution of a nitrate of the group of metals consisting of alkali metals and alkaline earth metals.

"5. A material for replenishing a coating bath, comprising water-soluble dihydrogen phosphate as the major portion of its coating chemicals and comprising also an oxidizing agent having an oxidation potential not greater than the potential of the common bromates in a dilute phosphate solution."

These claims, read in connection with the specifications, clearly disclose what the patentees claimed to be their invention or discovery.

10. The patent points out the necessity for keeping the bath in balance, as referred to in finding 3. In order to have the solution in balance it is necessary to have it supersaturated at the surface of the work, that is, the coating action commences when there is not enough acid in that portion of the solution adjacent to the work to hold the zinc phosphate in solution. Zinc phosphate then comes out of that portion of the solution and deposits on the work. This local high supersaturation is caused by the metal entering the solution due to its oxidation by the hydrogen ion or other oxidizing agent. In so oxidizing the metal, acid is consumed. If the solution as a whole is kept in a high state of super-

saturation, less acid has to be consumed and less iron is required to enter the solution, and, conversely, the more acid the solution as a whole is, the more acid there is which has to be consumed and the more iron must enter the solution to cause this high supersaturation. When local high supersaturation is attained, that is, when the bath is in a condition which will produce a coating in one minute, the reaction is such that the zinc crystallized out of the solution forms the desired coating on the metal. In the commercial process the coating formed on the metal is composed partly of ferrous phosphate and partly of zinc phosphate. Commercially, there is no objection to a portion of the coating being composed of ferrous phosphate.

11. As heretofore pointed out, if the bath is permitted to stand for some time after being made up, the coating time increases. It is agreed that the coating time for ferrous phosphate is longer than the coating time for zinc phosphate, all other conditions being equal. The patent teaches that the addition of an oxidizing agent having an oxidation potential not greater than the potential of the common bromates in a dilute phosphate solution will expedite the coating action upon the surface of the metal. It is the theory of the patent that this result is attained because of the oxidation of the atomic hydrogen which accumulates on the surface of the work and which prevents or retards the coating action of the solution. It is the defendant's and the patentee's theory that if this hydrogen is removed from the surface of the article after it has accepted the electrons from the metal of the article, more hydrogen ions will quickly attack the surface of the article and cause the iron to dissolve more rapidly, thus expediting the coating action of the bath. The patentees claim that by introducing into the bath the oxidizing agent described in the patent this hydrogen will be quickly oxidized and more hydrogen ions will be available to attack the surface of the article and dissolve the iron more rapidly, and thereby expedite the coating action of the solution; that if the hydrogen on the surface of the metal is not oxidized the atomic hydrogen will combine to form molecular hydrogen, which in turn will form bubbles and will escape from the surface of the work into the atmosphere. Prior to the issuance of the patent in suit it was the belief of those familiar with the art that a violent hydrogen bubbling on the surface of the work

was desirable, because it indicated that the coating reaction was going forward rapidly, and if no bubbling occurred at the surface of the work the coating reaction was not going forward and no coating was being formed upon the work. It was customary, in operating these phosphate coating solutions, to determine the completion of the coating action of the solutions upon the work by the cessation of the hydrogen bubbling. Prior to the time the patentees discovered that it was unnecessary to have the bubbling of the visible hydrogen in order to get satisfactory results, those in the art had accepted as a necessary concomitant of successful operation this release of molecular hydrogen, and to those familiar with the art the result achieved by including the oxidizing agents in the bath came as a surprise and an unlooked-for result.

12. In both of plaintiff's processes it uses sodium nitrite in the same way that defendant does, and in the same manner disclosed by the patent in suit. It is plaintiff's theory, however, that the oxidizing agents of the patent do not oxidize the hydrogen which would otherwise accumulate on the surface of the article, but instead that these oxidizing agents themselves attack and oxidize the metal at the surface of the article by accepting electrons therefrom, thereby causing the metal of the article to dissolve more rapidly than it would if attacked only by the hydrogen ions of the solution. It is plaintiff's claim that the sodium nitrite added to the bath of its Spray Granodine and Electro Granodine processes, hereinafter described, carried out in accordance with the plaintiff's instructions, is added not for the purpose of oxidizing the hydrogen, but rather for the purpose of maintaining the bath in balance and in a high state of supersaturation and to keep down the amount of ferrous phosphate in solution. It is plaintiff's theory that when the sodium nitrite is introduced into the bath, nitrous acid and mono-sodium phosphate are formed without change in the free acid content of the bath; that the nitrous acid, likewise without change in the free acid content of the bath, converts any ferrous phosphate in the bath to ferric phosphate, which, being relatively insoluble, precipitates out of the solution; and that, if ferrous iron were not removed from the bath, part of it would be oxidized to ferric iron by the air, with the resultant increase of the free acid content of the bath and consequent increase in the coat-

ing time. The plaintiff makes up its baths in a high state of supersaturation, that is, it dissolves all of the zinc phosphate that can be dissolved in the phosphoric acid. It is plaintiff's claim that in this condition coatings will form rapidly if a sufficient amount of the solution comes into contact with the metal, but plaintiff admits that in order to keep its bath operating effectively it is necessary to add sodium nitrite while work is being processed. The sodium nitrite added to plaintiff's baths is shipped to customers separate from the materials used for making the zinc phosphate bath, being marketed under the trade name "Toner".

13. The sodium nitrite used by plaintiff is one of the oxidizing agents named in defendant's patent. It is impossible to maintain the coating time necessary for successful commercial operation of plaintiff's processes without the use of sodium nitrite. The presence of nitrite in the plaintiff's bath does eliminate the hydrogen bubbling on the surface of the work and does make it possible to obtain rapid coating action by the solution and maintain such rapid coating time for long and continuous periods, and there is no other method known to the art for producing this result.

One of the theories advanced by research chemists, and quite generally accepted by them, is that the hydrogen ions in the acid solution attack the surface of the metal, accept electrons therefrom, change to the atomic state, eventually evolve into the molecular state, and then form bubbles of molecular hydrogen, which eventually break away from the surface of the article and pass off as bubbles through the solution. It is part of this theory that it takes an appreciable interval for the transition of the hydrogen ions through the atomic to the molecular and bubble state, and that this prevents additional hydrogen from quickly attacking the surface of the article, causing the metal to dissolve less rapidly and appreciably slowing up the dissolution of the metal. Chemists advancing this theory also claim that the oxidizing agents will immediately oxidize this hydrogen in its atomic state and accelerate or expedite its removal from the surface of the work, thereby permitting additional hydrogen ions to rapidly attack it, and in this manner expedite the coating process.

14. In carrying out its commercial processes plaintiff uses a zinc phosphate coating solution made substantially as described in the Coslett patent, adds thereto sodium nitrite, and applies it to the surface to be coated either by spraying through the air large quantities of this solution upon the work, or by immersing the work in a tank containing the solution. In either case the work is thoroughly cleaned prior to the processing. The bath is kept in a supersaturated condition by adjusting the amount of sodium nitrite added to the bath to compensate for the acid being formed. The nitrite also changes a part of the ferrous phosphate which forms in the solution to ferric phosphate, which in turn is mostly precipitated out of the solution as a sludge, because the ferric phosphate is substantially insoluble in these baths. Part of the ferrous phosphate, however, forms a coating upon the work, as much as twenty-five per cent of the final coating being a ferrous phosphate coating. Sodium nitrite and zinc phosphate are added to the solution while the bath is in use to maintain the zinc content of the bath at a substantially uniform level. In the spraying process, coatings may be produced in one minute or less. In the Electro Granodine Process of the plaintiff, the work is immersed in a bath (made substantially the same as the spray bath) in a metal tank, and alternating current is passed through this bath, using the work as one of the electrodes and the metal tank as the other. In both of these processes it is possible to get a good coating in a short time without sodium nitrite when the bath is freshly made up. The coating process is expedited by the use of the electric current as used by plaintiff in its Electro Granodine process, and the magnitude of the current influences the rate of the coating. In both the Spray Granodine and Electro Granodine processes the sodium nitrite removes the ferrous iron from the solution without introducing free acid and, therefore, without upsetting or disturbing the balance of the solution.

15. The oxidizing agents named in the patent in suit do oxidize hydrogen at the surface of the work as claimed in the patent. The process has met with unusual commercial success and marks a distinct step forward in the art. The claims of the patent in suit are valid.

16. The materials used by plaintiff in its solutions are the same as the materials described in defendant's patent. They are used in the same manner. The results

produced by their use are the same. This constitutes an infringement of the claims in suit.

The most that can be said for plaintiff is that it claims that the reason given by the patentees for the success of their invention is not the correct reason. It is plaintiff's claim that the inventors were in error when they concluded that the removal of hydrogen at the surface of the metal was the thing that made it possible to continue getting satisfactory coatings in phosphate baths in short periods of time and to continue keeping the bath operating in this manner. Plaintiff has failed to sustain the burden of proof to establish the invalidity of the claims in suit on this theory.

17. The following prior art patents were relied upon by plaintiff, either as anticipations of the patent in suit or to sustain its claim that the claims in suit are invalid for lack of invention over the art:

| | |
|---|---|
| Heathcote (British) | 20,798 |
| Abraham | 1,493,012 |
| Richards | 1,069,903 |
| Gravell | 1,221,046 |
| Williams | 1,514,494 |
| Chadwick | 1,320,734 |
| Allen | 1,287,605 |
| Allen | 1,291,352 |
| Allen | 1,167,966 |
| Cole | 1,719,463 |
| Thompson & Tanner | 1,869,121 |
| Chadwick | 1,317,351 |
| Schmidding (German) | 310,756 |
| Coslett | 1,610,362 |

The most that can be said for any of these patents is that they might have suggested to an expert the field within which to work to discover a process which would produce the results that the patentees wished to achieve. None of them can be considered as anticipations. The advance of the claims in suit over the prior art is one that required inventive genius.

### Conclusions of Law.

1. Claims 2, 3, 4 and 5 of Patent No. 1,911,726 are valid, and represent an important advance in the art to which the patent relates. The claims in suit are not met nor anticipated by any of the prior patents, publications, or prior uses which have been urged against them. The invention of the claims in suit is the joint invention of the patentees named in the patent, and it was validly granted to them jointly. The defendant and counter-claim-ant, Parker Rust Proof Company, is entitled to a judgment against the plaintiff and counter-defendant, American Chemical Paint Company, holding claims 2, 3, 4 and 5 of the patent in suit, No. 1,911,726, valid and infringed, and providing for a permanent injunction against the American Chemical Paint Company enjoining it from infringing said claims in suit, an accounting from said plaintiff for all profits gained by it on account of its past infringement, and all damages sustained by the defendant on account of said infringement, and its costs in this suit, including stenographic reporting services. Dow Chemical Co. v. Williams Bros., etc., Corp., 10 Cir., 81 F. 2d 495; Root Refining Co. v. Universal Oil Prod. Co., 3 Cir., 78 F.2d 991; Webster Loom Co. v. Higgins et al., 105 U.S. 580, 26 L.Ed. 1177; Carnegie Steel Co. v. Cambria Iron Co., 185 U.S. 403, 22 S.Ct. 698, 46 L.Ed. 968; Diamond Rubber Co. v. Consol. Rubber Tire Co., 220 U.S. 428, 31 S. Ct. 444, 55 L.Ed. 527; Parker Rust Proof Co. v. Ford Motor Co., 6 F.2d 649, D.C.E. D.Mich.S.D.; Ward Baking Co. v. Hazleton Baking Co., 292 F. 202, D.C.,M.D.Penn.

2. Plaintiff, American Chemical Paint Company, is not entitled to any of the relief prayed for in its complaint.

Judgment shall be entered in accordance herewith.